FILED
AUG 13 2026
2026 AUG 13 AM 11:03
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY: Ong

Jonathan Beacher
jonbeacher@gmail.com
PO Box 98
Seattle, WA 98111
Tel: (425) 523-7550
Fax: (425) 903-3975
Plaintiff in Pro Se

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

JONATHAN BEACHER,

Plaintiff,

vs.

DOMUSO, INC.,

Defendant.

Case No.: 2:26-cv-09014-AH-PVCx

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF PURSUANT TO 12 U.S.C. § 5567**

**DEMAND FOR JURY TRIAL**

## PRELIMINARY STATEMENT

1. Plaintiff Jonathan Beacher was a Quality Assurance Engineer at Domuso, Inc.

2. Repeatedly during his employment, Plaintiff objected to Defendant's test and release policy, under which he was directed to manually test a new feature and grant quality assurance approval before building and completing the automated regression tests for it, where that approval served as the gate for releasing the feature to consumers. He raised these objections repeatedly to

Defendant's engineering team and management throughout his employment. Defendant has acknowledged that conduct in its own filings and has stated that the delays it attributes to that conduct factored into Plaintiff's selection for layoff. Defendant terminated his employment on February 11, 2025.

3. Regression testing is the process of re-testing previously approved software features to confirm that new code changes have not compromised existing functionality. It can be performed manually by testing personnel or by automated regression tests built by engineers. Consider a schedule in which Feature 1 is released on Monday, Feature 2 on Tuesday, and Feature 3 on Wednesday. Releasing Feature 3 on Wednesday introduces new code into the shared codebase, creating the risk that Feature 1 or Feature 2 will function incorrectly; regression testing on Wednesday therefore means re-testing Features 1 and 2, and it can be performed manually by testing personnel or by automated regression tests built by engineers. If regression testing is performed by neither method, defects introduced into previously released features are detected, if at all, by the software's users encountering them in production.

4. On the date of termination, Defendant gave Plaintiff a written Notice of Change of Employment Status, addressed "To: Employees Affected" and captioned "Notice of Layoff Due to Company Restructuring." The Notice stated that "due to the Company's revenues not reaching forecasted goals, market impacts have resulted in financial constraints at the Company, and we have no choice but to conduct a restructuring of the Company's positions and internal reporting structures"; that "[d]ue to this restructuring of positions and the Company's need to keep costs down, your position is being eliminated"; and that "termination of your employment is as a result of layoffs due to the Company's restructuring." The Notice did not identify the criterion by which Plaintiff was selected for the layoff.

5. Defendant identified that criterion to Plaintiff for the first time in a

September 24, 2025 submission to the Occupational Safety and Health Administration, filed after Plaintiff's retaliation complaint, in which Defendant stated that Plaintiff "had to be coached at times to run manual testing, instead of relying solely on automated testing. The resulting delays impacted productivity, which factored into his selection for layoff when compared to the nonsupervisory coworker who was retained." In an April 24, 2026 submission to OSHA, Defendant stated "[a]t the time of his termination, Respondent advised Mr. Beacher he was selected due to financial concerns. Following the initiation of this investigation, Respondent clarified that Mr. Beacher's specific selection was driven by (among other things) his habit of logjamming Respondent's non-negotiable application testing process." Plaintiff brings this action under the whistleblower protection provisions of the Consumer Financial Protection Act, 12 U.S.C. § 5567. Under § 5567(a)(4), it is unlawful to retaliate against an employee who has "objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee (or other such person) reasonably believed to be in violation of any law, rule, order, standard, or prohibition, subject to the jurisdiction of, or enforceable by, the Bureau."

6. Plaintiff filed a whistleblower complaint with the Consumer Financial Protection Bureau (the "Bureau") on or around October 11, 2024. Under § 5567(a)(1), it is unlawful for a covered person to retaliate against an employee who has "provided, caused to be provided, or is about to provide or cause to be provided, information to the employer, the Bureau, or any other State, local, or Federal, government authority or law enforcement agency relating to any violation of, or any act or omission that the employee reasonably believes to be a violation of, any provision of this title or any other provision of law that is subject to the jurisdiction of the Bureau, or any rule, order, standard, or prohibition prescribed by the Bureau."

7. Quotations in this Complaint are taken from the source documents,

filings, and communications identified, and are reproduced as written, including any errors in the original. Plaintiff will produce the underlying documents in discovery.

## JURISDICTION

8. This civil action arises under the whistleblower protection provisions of the Consumer Financial Protection Act (CFPA), 12 U.S.C. § 5567.

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (Federal Question).

## VENUE

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). Defendant is a Delaware corporation with its principal place of business in this District and is deemed to reside here under § 1391(c)(2), and a substantial part of the events giving rise to this action—including the decision to terminate Plaintiff's employment—occurred in this District.

11. Defendant Domuso, Inc. ("Domuso") conducts business within this District. Plaintiff's IRS Form W-2 Wage and Tax Statements for 2022 and 2023 reflect a business address for Defendant of 2110 Main Street Ste 302, Santa Monica, CA 90405, and Plaintiff personally attended that office during his employment. Plaintiff's IRS Form W-2 Wage and Tax Statements for 2024 and 2025 reflect a business address for Defendant of 11726 San Vicente Blvd, Los Angeles, CA 90049. On July 29, 2026, the Colorado Attorney General filed a complaint against Defendant in the District Court for the City and County of Denver, Colorado (the "Colorado AG Complaint"). The Colorado AG Complaint alleged that Defendant is a Delaware corporation with its principal place of business at 11726 San Vicente Blvd Ste 500, Los Angeles, CA 90049.

12. The employment decisions giving rise to this action, including the

decision to terminate Plaintiff, were made in Los Angeles County, California, where both business addresses alleged above are located. In Defendant's March 2, 2026 response to the Labor Commissioner in State Case No. RCI-CM-1117402, Defendant identified Chief Financial Officer Bryan Babineau and Chief Technology Officer Jose Godinez as the individuals involved in making the decision regarding Plaintiff's change in employment status. On information and belief, Bryan Babineau and Jose Godinez reside in Los Angeles County or Santa Barbara County, California, each within the Central District of California.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

13. On August 8, 2025, Plaintiff filed a whistleblower retaliation complaint with the Occupational Safety and Health Administration (OSHA) of the United States Department of Labor regarding his termination on February 11, 2025, initiating OSHA Case No. 301059066.

14. Plaintiff's complaint to OSHA was filed within 180 days of the alleged adverse action.

15. On May 18, 2026, the preliminary OSHA investigation concluded.

16. Plaintiff timely filed objections to the findings and requested a hearing before the Office of Administrative Law Judges (OALJ) within the 30-day statutory deadline.

17. On May 19, 2026, the Office of Administrative Law Judges docketed Plaintiff's objections and hearing request as OALJ Case No. 2026-CFP-00011, Beacher v. Domuso.

18. On August 6, 2026, Chief Administrative Law Judge Stephen R. Henley issued and signed a Notice of Docketing in OALJ Case No. 2026-CFP-00011. The Notice states that OSHA dismissed Plaintiff's complaint by letter dated May 18, 2026; that Plaintiff, representing himself, objected to the dismissal and requested a hearing before the OALJ, which docketed the case on

May 19, 2026; and that the case "is not yet assigned to a presiding administrative law judge." The Notice further states that a Notice of Hearing and Prehearing Order will be sent to the parties once the matter is assigned to an administrative law judge, and directs the parties not to file any documents or motions until a presiding administrative law judge is assigned. A footnote to the Notice states that the delay between the date of docketing and the Notice resulted from miscommunication among OALJ staff and was not the fault of the parties.

19. As of the filing of this action, no presiding administrative law judge has been designated in OALJ Case No. 2026-CFP-00011, no hearing has been scheduled or held, and no decision on the merits has issued. The case has been docketed with the Office of Administrative Law Judges since May 19, 2026 without assignment of a presiding administrative law judge. The administrative proceeding remains pending without a final decision approximately one year after Plaintiff filed his OSHA complaint on August 8, 2025.

20. The service sheet accompanying the August 6, 2026 Notice of Docketing identifies Darren Feider and Monica Ghosh of Sebris Busto & James, 15375 SE 30th Place, Bellevue, Washington 98007, as the recipients served on behalf of Respondent Domuso, and they are Defendant's counsel of record in the administrative proceeding.

21. Because Plaintiff timely filed objections and requested a hearing within 30 days of receipt, the preliminary findings did not become a final decision of the Secretary under 12 U.S.C. § 5567(c)(2)(C) or 29 C.F.R. § 1985.106(b). No final order of the Secretary has issued.

22. Plaintiff received the written determination under 29 C.F.R. § 1985.105(a) on May 19, 2026. This action is filed within 90 days after receipt of that written determination, and there has been no final decision of the Secretary. Plaintiff satisfies 29 C.F.R. § 1985.114(a)(1).

23. The Secretary of Labor did not issue a final decision within 210 days

after the August 8, 2025 filing of the administrative complaint, and has issued no final decision since. The delay is not due to any bad faith of Plaintiff, who timely met each deadline in the administrative proceeding, as alleged above, and the Notice of Docketing itself states that the delay between the date of docketing and the issuance of that Notice resulted from miscommunication among OALJ staff and was not the fault of the parties, as alleged above. Plaintiff also satisfies 12 U.S.C. § 5567(c)(4)(D)(i) and 29 C.F.R. § 1985.114(a)(2).

24. Pursuant to 12 U.S.C. § 5567(c)(4)(D)(i) and the independent provisions of 29 C.F.R. § 1985.114(a)(1) and (a)(2), Plaintiff exercises his statutory right to bring this action at law for de novo review in federal district court.

25. This proceeding is governed by the legal burdens of proof specified in 12 U.S.C. § 5567(c)(3). Under 12 U.S.C. § 5567(c)(4)(D)(ii), "[a] proceeding under clause (i) shall be governed by the same legal burdens of proof specified in paragraph (3)." Section 5567(c)(3)(C) provides: "The Secretary of Labor may determine that a violation of subsection (a) has occurred only if the complainant demonstrates that any behavior described in paragraphs (1) through (4) of subsection (a) was a contributing factor in the unfavorable personnel action alleged in the complaint. Relief may not be ordered under subparagraph (A) if the employer demonstrates by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of that behavior." Those burdens are implemented by 29 C.F.R. §§ 1985.109 and 1985.114(c).

26. Within seven days after filing this complaint, Plaintiff will file a file-stamped copy of it with the Office of Administrative Law Judges, before which his hearing request is pending, and will serve a copy on the OSHA official who issued the findings, the Assistant Secretary, and the Associate Solicitor, Division of Fair Labor Standards, U.S. Department of Labor, as required by 29

C.F.R. § 1985.114(d), and will serve a copy on Defendant's counsel of record in the administrative proceeding.

## PARTIES

27. Plaintiff Jonathan Beacher holds a Bachelor of Science (B.S.) and Master of Science (M.S.) in Computer Science from San Diego State University.

28. In October 2021, Plaintiff filed a consumer complaint with the Consumer Financial Protection Bureau concerning a credit card billing matter unrelated to Defendant, and through that complaint became familiar with the Bureau, its role in receiving and acting on consumer complaints regarding payment products, and the fact that the Bureau prescribes regulations governing consumer payment products.

29. Plaintiff was hired by Defendant as a Quality Assurance Engineer on or around February 7, 2022.

30. On or around February 15, 2023, Defendant raised Plaintiff's annual salary from $110,000 to $120,000, communicated to Plaintiff in writing by his direct supervisor as a performance-based merit raise.

31. Plaintiff was employed in this capacity until his termination on February 11, 2025.

32. Plaintiff was a covered employee within the meaning of 12 U.S.C. § 5567(b) and 29 C.F.R. § 1985.101(i), which define a covered employee as any individual performing tasks related to the offering or provision of a consumer financial product or service. Plaintiff's duties as a QA Engineer consisted of testing and validating the consumer-facing payment features of Domuso's platform—including the rent-payment flows, the DCash ACH payment pipeline, and the Plaid financial integration through which consumers transmit funds. Those tasks were performed in connection with the offering and provision of Domuso's consumer payment services, and Plaintiff was performing them at the

time he engaged in the protected activity alleged below. Plaintiff performed those tasks throughout his employment, including on the dates of each protected activity alleged below and on February 11, 2025.

33. The Secretary of Labor determined in the May 18, 2026 findings that Plaintiff is an employee within the meaning of 12 U.S.C. § 5567.

## THE DEFENDANT

**Defendant Domuso, Inc.**

34. Defendant Domuso is a Delaware corporation registered to do business in California that conducts business in this District, with a business address of 2110 Main Street Ste 302, Santa Monica, CA 90405 as reflected on Plaintiff's IRS Form W-2 Wage and Tax Statements for 2022 and 2023, and a business address of 11726 San Vicente Blvd, Los Angeles, CA 90049 as reflected on those statements for 2024 and 2025. The Colorado AG Complaint alleged that Defendant is a Delaware corporation with its principal place of business at 11726 San Vicente Blvd Ste 500, Los Angeles, CA 90049.

35. The allegations of the Colorado AG Complaint described in the following paragraphs are alleged here as allegations made by the Colorado Attorney General, not as findings or admissions. Plaintiff further alleges that the Final Consent Judgment resolving that complaint contains no admission of liability by Defendant. Where this Complaint alleges statements or representations made by Defendant within the Final Consent Judgment itself, those are alleged as Defendant's own statements.

36. Under the heading "Domuso's Business and Certified Funds Model," the Colorado AG Complaint described Domuso's business as follows: Domuso provides software to properties and tenants in the multi-family apartment industry, including portals to pay rent digitally, submit maintenance requests,

communicate with property staff, and participate in loyalty programs. Domuso markets its platform to properties as a way to avoid risks to landlords historically associated with accepting card and ACH payments, such as chargebacks and ACH returns. Domuso's "Certified Funds" product addresses these concerns by immediately paying properties and guaranteeing the payment, while Domuso absorbs the risk of chargebacks and returns. Domuso outsources chargeback handling to a vendor (ChargebackGuru). If a tenant misses a payment or prevails in a card dispute, Domuso places the tenant into a "recovery" status, blocking further use of Domuso's platform until the account is brought current. After 30 to 45 days, Domuso sends delinquent amounts to collections. Domuso began "certifying" ACH payments and later expanded certification to credit and debit card payments. To pay rent by either debit or credit cards, tenants must certify the payment (and incur a fee), but for ACH payments, tenants can decide whether to pay with a certified option or not. Before Domuso began offering "certified" card payments, it was already charging percentage-based card payment fees and labeled them as "convenience fees." Domuso derives significant revenue from consumer-paid fees and has grown that revenue by structuring payment environments that rely on card-based payments. Domuso has represented to shareholders that when properties require digital payments and eliminate paper checks, the "average revenue per unit" increases from approximately $1 per unit to approximately $3.50 per unit—an increase of roughly 250%.

37. Under the heading "Fee Sharing with Properties," the Colorado AG Complaint further alleged as follows: Domuso charges low or no fees to properties for its services but derives substantial revenue from the percentage-based card fees it charges to tenants. Domuso's financial incentives are aligned toward maximizing consumer-paid fees rather than reducing costs to tenants. The volume of these consumer-paid fees is so substantial that on August 1, 2024, Domuso entered into an agreement with at least one large property client

to share a portion of the revenue generated from those tenant fees. This revenue-sharing arrangement increases Domuso's and the property's financial benefit when tenants incur percentage-based card fees. As a result, Domuso has a business incentive to promote payment environments in which tenants are more likely to use payment methods that incur percentage fees.

38. At all relevant times, Domuso was Plaintiff's employer.

39. Domuso is a covered person within the meaning of 12 U.S.C. § 5481(6)(A), which defines a covered person as any person that engages in offering or providing a consumer financial product or service. Domuso offers and provides such a service: it operates the platform through which residential tenants pay their rent, processing consumer payments by electronic means, including ACH transactions and bank-account integrations. Providing payments processing to a consumer by technological means, including through payments systems or networks used for processing payments data, is a financial product or service under 12 U.S.C. § 5481(15)(A)(vii), and it is a consumer financial product or service under 12 U.S.C. § 5481(5) because Domuso offers and provides it for use by consumers primarily for personal, family, or household purposes—the payment of residential rent.

40. The Secretary of Labor determined in the May 18, 2026 findings that Defendant is a covered person or service provider within the meaning of 12 U.S.C. § 5567.

41. Under 12 U.S.C. § 5567(a), no covered person or service provider shall terminate or in any other way discriminate against, or cause to be terminated or discriminated against, any covered employee or any authorized representative of covered employees by reason of the fact that the employee engaged in activity protected under § 5567(a)(1)–(4).

## STATEMENT OF FACTS

**Relevant Personnel**

42. At all relevant times, Dennis Carlos was Domuso's Senior Quality Assurance Engineer Lead ("Senior QA Engineer") and Plaintiff's direct supervisor, with supervisory functions including approving paid time off, conducting annual performance reviews, and assigning work within the QA team. Apart from those functions, Dennis Carlos performed the same hands-on individual- contributor QA work as the QA Engineers he supervised, personally testing features and regularly creating pull requests in Domuso's code repositories.

43. On information and belief, Alex Sohn was employed by Domuso as a QA Engineer from approximately February 2020 to February 2022, when he left the company to work elsewhere. Domuso rehired Alex Sohn as a QA Engineer on or around March 2024. At the time of the February 11, 2025 layoff, Alex Sohn had worked at Domuso for approximately eleven continuous months since his rehire, and approximately thirty-five months counting both terms of employment combined. At that same time, Plaintiff had worked at Domuso for thirty-six continuous months without interruption. Apart from Senior QA Engineer Dennis Carlos, Alex Sohn was the only other QA Engineer Domuso employee (W-2) on Plaintiff's team, and he was retained when Plaintiff was terminated.

44. At all relevant times, Michael Lightfoot was Domuso's Chief Executive Officer ("CEO"), Bryan Babineau was Domuso's Chief Financial Officer ("CFO"), and Jose Godinez was Domuso's Chief Technology Officer ("CTO").

45. On July 27, 2026, Michael Lightfoot executed the Final Consent Judgment resolving the Colorado AG Complaint on behalf of Domuso, signing as "President and CEO." The Final Consent Judgment states: "The State of Colorado began investigating Domuso on or around October 22, 2024 for alleged violations of the Uniform Consumer Credit Code, sections 5-1-101, C.R.S., et seq. ('UCCC')

and the Colorado Consumer Protection Act, sections 6-1-101, C.R.S., et seq. ('CCPA')."

46. Brandon Haller was Domuso's Director of Engineering, hired in or around August 2024.

47. On information and belief, Domuso engaged a contract QA Engineer known to Plaintiff as Shraddha, whose surname begins with the letter V but is otherwise unknown to Plaintiff and is within Defendant's knowledge, and who is referred to in this Complaint as "Shraddha V." Shraddha V. worked with Plaintiff's QA team during his employment, and is the contract employee whom Defendant, in its September 24, 2025 submission to OSHA, described as having "specialized experience and domain knowledge." The OSHA investigator's March 31, 2026 request, alleged below, sought documentation showing that the retained contract employee had specialized experience and domain knowledge that Plaintiff did not have.

48. On information and belief, Chunseo Choi was Domuso's Director of Payments at all relevant times. Roman Wroclowski was employed by Domuso as a Principal Software Engineer and, on information and belief, was promoted to Engineering Manager in or around 2024.

49. Ron Klein was Domuso's Vice President of Product and Head of Product, hired in or around April 2023.

**Domuso's Terms of Service**

50. Defendant publishes Terms of Service governing consumers' use of its platform. This section quotes the version of the Terms of Service bearing a "Last Updated" date of December 17, 2024, which was in effect on February 11, 2025. All quotations in this section are reproduced verbatim as written, including any errors in the original.

51. Section 1.2(i) of the Terms of Service provides: "Domuso Payments is

a payment facilitation Service offered through the Platform enabling Renters to pay rent, utilities, security deposits, HOA fees, fees and other various payment types to Landlords with respect to Partner Properties ('Rental Payments') via credit card, debit card, eCheck/ACH, cash at third party MoneyGram locations and scanned paper checks (including personal checks, money orders and cashier checks)."

52. Section 1.2(iv) of the Terms of Service provides: "Where made available by the Landlord, Domuso allows you to use your bank account for electronic check (eCheck) payments. This payment method is also called ACH debit, as it uses the Automated Clearing-House network. Your completion of an eCheck payment constitutes your authorization to transfer the sum specified by you from your bank account to the Landlord. After authorizing an ACH debit or AutoPay, you will not be able to cancel the electronic transfer." Section 1.2(v) provides: "Where made available by the Landlord, Domuso allows Landlords to capture and scan paper check (including money orders and cashiers checks) payments. Scanned paper check payments, where eligible and as determined by Domuso, will or may be converted into ACH transactions ('ACH Conversion') and processed as an electronic funds transfer." The same provisions appear in the version effective March 21, 2022 and the version bearing a "Last updated" date of June 14, 2024.

53. Section 1.2(vii) of the Terms of Service provides: "If a Rental Payment is rejected, returned or declined, you may be subject to penalties, late fees, return fees, insufficient funds (NSF) fees, and/or interest charges as assessed by the Landlord or as assessed by your banking or card institution. You acknowledge, agree and authorize Domuso to process automatic NSF fees, as permitted by applicable law, to the same account from which your payment was initiated. All Rental Payments made through the Platform are final (unless the payment is declined or rejected by the Landlord), and you may not request or seek any refund

or chargeback or otherwise cancel or reverse such a payment once authorized." The same provision appears in the version effective March 21, 2022 and the version bearing a "Last updated" date of June 14, 2024.

54. Section 1.2(ix) of the Terms of Service provides, in capitalized text: "YOU AND NOT DOMUSO ARE RESPONSIBLE FOR ENSURING THAT TIMELY PAYMENTS OF ALL AMOUNTS ARE MADE TO THE LANDLORD. FURTHER, YOU AND NOT DOMUSO ARE RESPONSIBLE TO ENSURE THAT THE AMOUNT OF ANY PAYMENT YOU MAKE USING THE PLATFORM IS CORRECT. DOMUSO DOES NOT REVIEW YOUR LEASE OR OTHER AGREEMENT OR OTHERWISE VERIFY THAT AMOUNTS PAID USING THE PLATFORM CONFORM TO ANY SUCH LEASE OR AGREEMENT. ANY DISPUTE REGARDING ANY PAYMENT OR AMOUNTS OWED BETWEEN YOU AND YOUR LANDLORD OR PROPERTY MANAGER SHALL BE RESOLVED SOLELY BETWEEN YOU AND THE LANDLORD OR PROPERTY MANAGER. DOMUSO IS NOT LIABLE IN ANY WAY FOR ANY SUCH AMOUNTS OR DISPUTES." The same provision, in the same capitalized text, appears in the version effective March 21, 2022 and the version bearing a "Last updated" date of June 14, 2024.

55. Section 1.1 of the Terms of Service provides: "You are permitted to access and use the Services if you are a Renter of a unit in a Partner Property for which the Services have been obtained by the applicable Landlord or their Property Manager pursuant to the Client Agreement." Section 1.1 further provides: "Furthermore, if your Landlord or their Property Manager terminates the relevant agreement in place between them and Domuso or decides to discontinue the Services at the Partner Property, you will no longer be able to use the Services." Section 1.2(ii) provides that the consumer acknowledges and agrees that "(g) if the Landlord terminates its agreement with Domuso, you will no longer be able to use the Platform or Services."

56. Section 3 of the Terms of Service states: “Domuso provides this error-resolution notice in compliance with the Federal Reserve's Regulation E, which governs EFTs,” followed by disclosures captioned §205.7(b)(1) through §205.7(b)(9). The disclosure captioned §205.7(b)(7) provides: “If you have enrolled in AutoPay for your Account you can stop any future payments. Here's how: Disable the AutoPay feature in your Domuso Account or email us at support@domuso.com in time for us to receive your request 3 business days or more before the payment is scheduled to be made.” Section 1.3 of the Terms of Service, captioned “Rewards Program,” provides: “Qualifying activities, as reflected in Domuso's records, shall be deemed correct, and Domuso reserves the right to determine the qualification for any transaction or activity.” Section 1.3 further provides: “A Unit must claim each earned Reward within ninety (90) days from the date Domuso notifies the Unit through the Services the Reward is eligible to be claimed, and in any case, prior to the expiration of the Units lease,” and: “If you fail to claim an eligible Reward within such a ninety (90) day period, or, if earlier, prior to the expiration of the then-current lease, the Reward shall be deemed waived and void.” The version bearing a “Last updated” date of June 14, 2024 contains no provision addressing the correctness of Domuso's records; the sentence beginning “Qualifying activities” first appears in the December 17, 2024 version. The error-resolution notice and §205.7(b)(1)–(9) disclosures also appear in the version effective March 21, 2022 and the version bearing a “Last updated” date of June 14, 2024.

**Background**

57. Domuso operates as a mandatory third-party rent-collection platform: tenants are required to use it to pay rent and cannot opt out to another provider to avoid its defects. A renter may use the platform only where the renter's landlord or property manager has obtained it, and has no ability to select, retain, or replace

Defendant as the provider, as quoted in Domuso's Terms of Service section above. Consumers have no ability to protect themselves from errors in the platform by taking their business elsewhere.

58. Tenants who pay by check or other non-electronic means remain subject to Domuso's platform, which records their payments, maintains their account histories, and generates any late fees or insufficient-funds charges; no payment method removes a tenant from the platform's accounting.

**The KRNV News 4 Reports**

59. In December 2022, NBC affiliate KRNV News 4 in Reno, Nevada publicly reported that a tenant on Defendant's platform accrued erroneous late fees and insufficient-funds charges exceeding $8,000 over roughly two years despite paying rent by cashier's check with sufficient funds each month. The report stated that the tenant "and other tenants are required to use" Defendant's platform.

60. The report further stated that the tenant, a U.S. Army veteran, had an account showing a balance due of more than $8,000 on the day the station visited, with a warning that he could be locked out of the account if he did not pay. The report stated the tenant's concern that he would be evicted right before Christmas, that the ordeal had taken a toll on him, and that he sometimes did not sleep and sometimes cried. The report further stated that neither the apartment complex, the property management company, nor Defendant responded to the station's inquiries.

61. The report stated that, within days after the station interviewed the tenant and began asking questions on his behalf, all of the charges were reversed, and reported the tenant's statement that his bank told him the charges resulted from an accounting error on Defendant's part.

62. In a follow-up report published in or around July 2023, KRNV News 4

reported that Defendant never provided the station any explanation of how the more than $8,000 in charges ended up on the tenant's account; that the tenant had since received a letter from a collection agency seeking $1,500 the agency claimed he owed from November 2022; that the tenant never owed any money to his apartment complex; and that the property management company told the station it was working to resolve the issue.

**The Role of Automated Testing**

63. In its September 24, 2025 submission to OSHA, Defendant stated: "Once manual testing is completed, test cases ideal for test automation are identified and automated for further testing. Automated testing allows the Company to run regression and smoke tests prior to any release."

64. In its March 2, 2026 position statement to the California Department of Industrial Relations, Defendant stated that "automated testing scripts can only find bugs the developer already knows exist."

65. In the same position statement, Defendant acknowledged that "code changes inevitably create issues in other, pre-existing areas of the program."

66. During Plaintiff's employment, Plaintiff's automated tests detected defects prior to release on multiple occasions, including defects that had not been anticipated by the developers whose code changes introduced them; on at least one occasion, in connection with a user-interface redesign, Plaintiff's automated tests detected a defect in code changes that the developer had represented he had already tested. On information and belief, records of those detections exist in Defendant's Jira issue- tracking system and are within Defendant's possession, custody, and control; Plaintiff will identify the specific detections after a reasonable opportunity for discovery. The user-interface redesign encompassed consumer-facing payment flows, including the card payment flow, for which Plaintiff built and ran automated tests.

67. In a written message to Senior QA Engineer Dennis Carlos sent on Defendant's internal Slack workspace, Plaintiff listed multiple defects that his automated tests had detected before release. That message is within Defendant's possession, custody, and control.

**The August 2024 Consumer Data Incident**

68. QA Engineer Alex Sohn tested and QA approved a new "Rewards" payment feature for deployment without building and completing the specific automated regression tests required to monitor it on or around July 3, 2024.

69. Alex Sohn did not conduct manual regression testing on or around August 17, 2024 for the new Rewards feature released on or around July 3, 2024.

70. Defendant did not require manual regression testing of the Rewards feature in connection with subsequent deployments, including the deployment on or around August 17, 2024.

71. On or around August 17, 2024, consumers reported that this broken feature had caused points that consumers had accrued through qualifying activities to be recorded incorrectly in Defendant's records. On information and belief, the defect affected all or substantially all consumers enrolled in the program. Section 1.3 of the Terms of Service then in effect—the version bearing a "Last updated" date of June 14, 2024—provided: "Earned Rewards must be claimed within ninety (90) days from the date Domuso notifies you through the Services a Reward has been earned," and: "If you fail to claim an earned Reward within such ninety (90) day period, the Reward shall be deemed waived and void." Correcting Defendant's records required Defendant to manually alter its own production database. Four months later, in the December 17, 2024 amendment, Defendant added to the Rewards Program section the following sentence, quoted in Domuso's Terms of Service section above: "Qualifying activities, as reflected in Domuso's records, shall be deemed correct, and Domuso

reserves the right to determine the qualification for any transaction or activity."

72. In or around August 2024, during an engineering standup discussion of the Rewards defect, Plaintiff asked the participants whether the defect was reproducible. Roman Wroclowski, then a Principal Software Engineer or, on information and belief, a newly promoted Engineering Manager, confirmed that the defect was reproducible. A reproducible defect is one that a feature-specific automated regression test, had one existed for the Rewards feature, could have detected upon the deployment that introduced it.

73. During the same discussion or another engineering standup discussion in or around August 2024, Chunseo Choi, Domuso's Director of Payments and, on information and belief, one of the only Domuso personnel with access to its production database, questioned, in substance, the legality of manually modifying Domuso's production database to correct the Rewards records. Chunseo Choi made that statement to the participants in the engineering standup, before Plaintiff filed his complaint with the Bureau, as alleged below.

74. The Rewards feature was released to consumers in July 2024 and was a pre-existing area of the program by August 2024. The deployment on or around August 17, 2024 was a release of unrelated functionality, after which the Rewards feature ceased functioning correctly. At the time of that deployment, no feature-specific automated regression tests existed for the Rewards feature. Neither Defendant's developers nor its QA personnel detected the defect before or upon release; consumers discovered the defect and reported it to Defendant. At the time the defect was introduced, the Rewards feature had neither feature-specific automated regression tests nor required manual regression testing under Defendant's test and release policy, as alleged above.

75. On information and belief, Defendant never disciplined, criticized, or negatively evaluated Alex Sohn in connection with the August 2024 defect, as alleged in the Clear and Convincing Evidence section below.

76. During an engineering standup discussion in or around August 2024, Roman Wroclowski stated, in substance, that Alex Sohn had done his job by manually testing the Rewards feature before its release. The defect nonetheless reached consumers and went undetected by Defendant until consumers reported it, as alleged above. Manual testing performed before a feature's release, however diligent, provides no mechanism to detect defects introduced into that feature by subsequent deployments. On information and belief, records of the engineering standup discussions alleged in this Complaint, including any recordings, notes, or related Slack messages, are within Defendant's possession, custody, and control.

**The Test and Release Policy**

77. As Senior QA Engineer, Dennis Carlos served as the gatekeeper for release: no new financial feature could be deployed to consumers until QA approval was granted.

78. On or around September 30, 2024, for the new DCash ACH pipeline (Plaid), Senior QA Engineer Dennis Carlos directed that Plaintiff manually test the feature and grant QA approval before building and completing any automated tests for it. DCash is Defendant's certified ACH payment option—the "certifying" of ACH payments described in the Colorado AG Complaint's account of Defendant's Certified Funds model, as alleged in the Defendant Domuso, Inc. section above. The rental payments processed through that pipeline are payments made through the Platform under Defendant's Terms of Service, as quoted in Domuso's Terms of Service section above.

79. The automated tests for the feature were deferred until after the feature was released to consumers.

80. Plaintiff performed the manual testing of the DCash ACH (Plaid) pipeline directed on or around September 30, 2024, and granted the QA approval that served as the gate for its release. The feature was released to consumers on or

around Defendant's October 15, 2024 deadline.

81. At the time of that release, no feature-specific automated regression tests for the DCash ACH (Plaid) pipeline ran on Defendant's deployments. Plaintiff at no time created a pull request for automation of that pipeline.

82. On information and belief, the feature-specific automated tests for the DCash ACH (Plaid) pipeline were later created by Senior QA Engineer Dennis Carlos, in one or more pull requests created and merged after the release. Defendant thus expended the resources to build those tests for that pipeline notwithstanding the deferral, and did so through its most senior Quality Assurance employee rather than through Plaintiff, whose formal job description required "Test Script Automation writing and Execution (Python, Selenium, RobotFramework, GitHub, CircleCI)," as alleged below. The deferral therefore did not avoid the cost of the automated regression tests; it postponed that cost until after the feature had been released to consumers. From the release until those tests were created, no automated mechanism existed to detect whether a subsequent deployment had broken that pipeline. The deadline for that release was driven by Defendant's desire to avoid renewing a year-long service contract with Yodlee: Director of Engineering Brandon Haller stated as much to Plaintiff, in substance, on the call on or around October 11, 2024 alleged in the Protected Activity section below, and Plaintiff reported that understanding to the Bureau the same day, as alleged below.

83. The release gate was satisfied by manual testing alone, while the automated regression testing for the feature was delayed. An automated regression test, once built for a feature, runs automatically on subsequent deployments and detects when a later code change breaks that feature.

84. Under either sequence, the same manual testing of the feature was performed. The directive did not add a testing requirement; it removed a condition of release. Had the feature-specific automated regression tests been built and

completed before QA approval, the feature and its tests would have been released together, and the interval alleged in the following paragraph would not have existed. Because QA approval was granted before those automated regression tests were built and completed, the release gate opened while those tests remained incomplete, and the work of building and completing them thereafter competed with subsequently assigned work under Director of Engineering Brandon Haller's directive that automation "can't be blocking, or take priority," as alleged below.

85. Under the policy, from the time a feature was released to consumers until its feature-specific automated regression tests were built and completed, no automated mechanism existed to detect whether a subsequent deployment had broken that feature. That condition persisted for as long as those tests remained incomplete. The policy applied to every new feature, so every new feature released to consumers passed through such an interval.

86. The policy was directed in writing on September 30, 2024: Senior QA Engineer Dennis Carlos stated an intent to "enforce no automation til after" release, and noted this would apply "Especially with Jon."

87. On information and belief, the directive implemented a policy set by Director of Engineering Brandon Haller and CTO Jose Godinez. Director of Engineering Brandon Haller stated in a company Slack channel that automation "can't be blocking, or take priority. If there is down time, that's fine, but it's not a priority from a project perspective at this stage."

88. In the same September 30, 2024 written directive, Senior QA Engineer Dennis Carlos stated that the team "may need to comment out Smoke TC related to yodlee once we see them breaking." A smoke test is an automated check that runs on each deployment to verify that core functionality still works; to comment out a smoke test is to disable it so that it no longer runs or reports failures. On information and belief, the existing payment smoke tests were those covering the Yodlee payment integration that Defendant was then phasing out in favor of the

Plaid integration.

**Card Payments**

89. Regulation Z, 12 C.F.R. Part 1026, a rule prescribed by the Bureau, implements the Truth in Lending Act, including the Fair Credit Billing Act. Under 12 C.F.R. § 1026.13, a consumer who pays by credit card may assert a billing error with the card issuer, and under 12 C.F.R. § 1026.12(c), a consumer may assert against the card issuer claims and defenses arising out of the transaction. Those rights run against the consumer's card issuer and exist independently of any agreement between the consumer and Defendant. The finality provision quoted in Domuso's Terms of Service section above applies by its terms to all “Rental Payments made through the Platform,” and Rental Payments are defined in Section 1.2(i) of the Terms of Service, quoted in that section, to include payments made by credit card and debit card.

90. The error-resolution notice in Defendant's Terms of Service, quoted in Domuso's Terms of Service section above, addresses electronic fund transfers under Regulation E. No provision of any version of the Terms of Service qualifies the finality provision quoted in that section as applied to card payments or discloses the billing-error or chargeback rights available to consumers who pay by card.

91. The Colorado AG Complaint alleged that if a tenant misses a payment or prevails in a card dispute, Domuso places the tenant into a “recovery” status, blocking further use of Domuso's platform until the account is brought current, and that after 30 to 45 days, Domuso sends delinquent amounts to collections, as alleged in the Defendant Domuso, Inc. section above.

**Electronic Fund Transfers**

92. The rental payments Defendant processes by eCheck/ACH debit, by

AutoPay, and by scanned paper check payments converted into ACH transactions are drawn from consumers' bank accounts. Section 1.2(iv) of Defendant's Terms of Service, quoted in Domuso's Terms of Service section above, provides: “This payment method is also called ACH debit, as it uses the Automated Clearing-House network,” and: “After authorizing an ACH debit or AutoPay, you will not be able to cancel the electronic transfer.” Section 1.2(v), also quoted in that section, provides: “Scanned paper check payments, where eligible and as determined by Domuso, will or may be converted into ACH transactions ('ACH Conversion') and processed as an electronic funds transfer.” The disclosure captioned §205.7(b)(4), among the disclosures alleged in that section, provides: “The type of electronic fund transfers that you may make through the Platform are described in Section 1 of these Terms.” The same sentence appears in the version effective March 21, 2022 and the version bearing a “Last updated” date of June 14, 2024.

93. Plaintiff filed his complaint with the Bureau on or around October 11, 2024. At all times during Plaintiff's employment, Defendant's Terms of Service contained the Regulation E compliance statement quoted in Domuso's Terms of Service section above as governing the electronic fund transfers processed through the Platform. Defendant terminated Plaintiff's employment on February 11, 2025.

94. Plaintiff's QA approval gated the release of the software that executed the transfers alleged above. Under the Electronic Fund Transfer Act's anti-waiver provision, 15 U.S.C. § 1693l, no writing or agreement may contain any provision constituting a waiver of any right conferred by that Act, which Regulation E implements. Defendant's Terms of Service nonetheless contained the finality provision and the consumer-responsibility provision quoted in Domuso's Terms of Service section above.

**A. Protected Activity**

95. Defendant's test and release policy, under which new financial features were released to consumers before their feature-specific automated regression tests were built and completed, is as alleged in The Test and Release Policy subsection above. The August 2024 Consumer Data Incident, alleged above, was an instance of the consumer harm that policy risked, and consumer financial injury arising from a payment-accounting defect on Defendant's platform had been publicly reported, as alleged in The KRNV News 4 Reports subsection above. Plaintiff's protected activity includes, but is not limited to, his objections to that policy and his report to the Consumer Financial Protection Bureau, alleged in this section.

96. Plaintiff's job description required him to "[c]ommunicate and contribute in product design and implementation meetings (Slack, Google Meet, Miro, Figma)"—among the channels through which he raised the objections described below. Defendant's Employee Handbook contains an "Open Door Policy" (Section 2-14) stating that "[a]ll employees have the opportunity to express ideas and opinions to management" and that "[a]ll employees may express ideas and opinions directly to Company management."

**Plaintiff's Objections**

97. Repeatedly during his employment, Plaintiff objected to Defendant's policy of releasing financial features to consumers before the feature-specific automated regression tests for those features had been built and completed. Plaintiff raised these objections in contemporaneous communications with the engineering team and management, through channels including team meetings, calls, internal messaging, and direct communications. The recipients of these objections included, but were not limited to, CTO Jose Godinez. Plaintiff objected that releasing payment features without their automated regression tests could

allow defects unknown to developers to reach consumers' financial accounts.

98. For example, in late September 2024, Plaintiff asked Senior QA Engineer Dennis Carlos in Slack: “do we have any figma diagrams for the flow?” and then objected in writing: “Im reading @Ron Klein s deadline is October 15th and we dont have any Figma diagrams for Plaid, to my knowledge? I think we as QA should to push back on this deadline, and call out we arent getting what we need; its quite rushed in my opinion for such a critical payment smoke flow.” The Figma diagrams Plaintiff identified were design specifications QA required in order to build the feature-specific automated regression tests for the DCash ACH (Plaid) pipeline; the deadline did not provide for them, so that the feature would necessarily be released to consumers before those tests could be built and completed. The “critical payment smoke flow” Plaintiff identified was the consumer-facing payment functionality that consumers use to pay rent.

99. On October 2, 2024, Plaintiff asked Director of Engineering Brandon Haller in Slack: “Can I get automation locator names for each of the new UI elements? With the October 15th deadline, it would be helpful to get a head start on automating this flow while DTECH-5291 swims over to the QA Review swimlane. When its in QA review I will focus on manual testing only.” The automation locator names Plaintiff requested were the stable element identifiers required to build the automated regression tests for the DCash ACH (Plaid) pipeline. Brandon Haller responded, in the same thread: “I want to be clear again: I don't mind you working on automation while waiting for a ticket to be manually testing, but the devs can't stop what they are doing to track down this list for you right now, especially on items not yet built.” Plaintiff responded, in substance, that the documentation for Appium, the test-automation framework, states that using XPath locators is not recommended and can lead to fragile tests, and directs testers to ask their development team to provide unique accessibility locators instead—the identifiers Plaintiff had requested.

100. When Plaintiff objected to the DCash ACH (Plaid) directive, he knew that the directive would release the DCash ACH pipeline to consumers without feature-specific automated regression tests, so that no automated mechanism could detect a later code change breaking it, and he knew that in August 2024 a defect of that kind had corrupted consumers' Rewards records and gone undetected until consumers reported it. He knew as well that the August 2024 defect had been confirmed reproducible in an engineering standup discussion, and that Domuso's Director of Payments had questioned, in substance, the legality of manually modifying the production database to correct consumers' records, as alleged in The August 2024 Consumer Data Incident subsection above.

101. In or around July 2023, while researching Defendant's public reputation, Plaintiff encountered both reports alleged in The KRNV News 4 Reports subsection above. After reading them, Plaintiff, already familiar with the Bureau from his 2021 complaint, reviewed materials on the Bureau's website concerning Regulation E and electronic fund transfers, and understood that a regulation prescribed by the Bureau governed electronic fund transfers of the kind Defendant processes. Plaintiff alleges those reports as evidence of the type and magnitude of consumer financial injury a payment-accounting defect on Defendant's platform can produce, and as a basis for the reasonableness of his beliefs alleged below.

102. Plaintiff also knew of the finality provision and the consumer-responsibility and dispute provisions quoted in Domuso's Terms of Service section above, under which a payment once authorized could not be refunded, charged back, cancelled, or reversed, and any dispute lay solely between the consumer and the landlord. Plaintiff understood those provisions to mean that a consumer whose payment was recorded wrongly had no mechanism to obtain correction of the charge from Defendant. Plaintiff was also aware that Regulation E guarantees error-resolution rights for electronic fund transfers and

that 15 U.S.C. § 1693l provides no agreement may waive them.

103. Plaintiff also knew, from his own work, that consumers paid rent through the platform by credit and debit card and that those payments were subject to the finality provision quoted in Domuso's Terms of Service section above, as alleged in the Card Payments subsection above. Plaintiff's duties included testing the consumer-facing payment features of Defendant's platform, as alleged in the Parties section above, and, in connection with the user-interface redesign alleged in The Role of Automated Testing subsection above, in or around 2022 to 2023, Plaintiff built and ran automated tests covering the card payment flow.

104. Plaintiff also knew that tenants could not take their business elsewhere. Plaintiff understood that the DCash ACH pipeline was the mechanism by which consumers' rent money moves from their bank accounts, and that an undetected defect in it could cause rent payments to fail or be misapplied, generating erroneous late fees and insufficient-funds charges against consumers who had in fact paid and could neither contest the error nor leave—financial injury of the type and magnitude alleged in The KRNV News 4 Reports subsection above.

105. On these facts, including the reproducibility of the August 2024 defect and the Director of Payments' questioning of the legality of the production database correction, and on the other information then known to him, Plaintiff reasonably believed, at the time of his objections and his report to the Bureau, that the directive and the policy it implemented subjected consumers to unfair, deceptive, or abusive acts or practices prohibited by 12 U.S.C. § 5531. Plaintiff further believed that the injury so risked was aggravated by Terms of Service he understood to be deceptive under that section. Plaintiff additionally believed that the directive and policy were inconsistent with Regulation E, 12 C.F.R. Part 1005, a rule prescribed by the Bureau. Plaintiff's belief that the directive and the policy

were deceptive rested on Defendant's presentation to consumers of their own payment records: an undetected defect in the DCash ACH pipeline could cause rent payments to fail or be misapplied, so that Defendant's platform would show a consumer who had in fact paid as not having paid, and would generate late fees and insufficient-funds charges against that consumer, as alleged above.

106. On or around October 11, 2024, Plaintiff objected to Defendant's test and release policy on a call with Director of Engineering Brandon Haller, on or around the same day Plaintiff filed his whistleblower complaint with the Consumer Financial Protection Bureau, as alleged below. During that call, Director of Engineering Brandon Haller asked Plaintiff whether the policy was illegal. On the same call, Brandon Haller stated, in substance, that the deadline for the DCash ACH (Plaid) release was driven by the need to avoid renewing Defendant's year-long service contract with Yodlee, and that the cost of the Yodlee subscription was approximately the annual salary of an engineer. Plaintiff reported the Yodlee-deadline understanding to the Bureau the same day, as alleged below.

107. Defendant has described Plaintiff's conduct with respect to its test and release policy in its own filings, stating in its September 24, 2025 submission to OSHA that Plaintiff "had to be coached at times to run manual testing, instead of relying solely on automated testing," and characterizing, in its April 24, 2026 submission to OSHA, Plaintiff's "habit of logjamming" its "non- negotiable application testing process."

**The CFPB Whistleblower Complaint**

108. On or around October 11, 2024, Plaintiff filed a whistleblower complaint with the Consumer Financial Protection Bureau regarding this test and release policy. This complaint was a continuation of the same objection Plaintiff had raised internally: that Defendant's policy of releasing financial features to

consumers before building and completing their feature-specific regression tests exposed consumers to financial harm.

109. In that complaint, Plaintiff wrote: "I had a call with the director of engineering today voicing my opinions again." In the same complaint, Plaintiff wrote: "I was recently assigned a task to test a Plaid integration service for Certified Bank Account Payments. I want to automate this critical payment flow before pushing to production to prevent similar issues as discussed." In the same complaint, Plaintiff attributed the policies to "the Director of Engineering Brandon Haller and the CTO Jose Godinez."

110. In that complaint, Plaintiff reported that Defendant's practice of shipping new financial features to consumers before building and completing the feature-specific automated regression tests for them had already caused consumers' account histories to be incomplete, with rewards payments not logged correctly; that customers rather than Defendant discovered the errors; that Defendant had to manually edit the production database to correct the missing data; and that these practices posed ongoing risks to consumers given Defendant's role in handling payment transactions.

111. In the same complaint, Plaintiff urged the Bureau to investigate Defendant's practices, stating that they "may not only harm consumers but could also result in violations of industry regulations governing payment processing and financial record-keeping," and raised "potential CFPB compliance concerns now and in the future, especially given the company's role in handling payment transactions." Plaintiff did not identify Regulation E by name in that complaint. Regulation E is a rule prescribed by the Bureau governing electronic fund transfers, and is a regulation governing payment processing and financial record-keeping of the kind Plaintiff's complaint referred to. Section 5567(a)(1) does not require that an employee identify a particular rule or regulation when providing information to the Bureau.

112. In the same complaint, Plaintiff requested anonymity and stated: "I fear that I will be fired by Domuso if they find out I reported this." Plaintiff made that statement approximately four months before Defendant terminated his employment.

113. In the same complaint, Plaintiff informed the Bureau that his concerns were not being addressed internally by upper management.

114. The complaint identified two consumers, by email address, who reported the Rewards account-history defect to Defendant on or about August 17 and August 19, 2024, and stated that Defendant did not discover the inaccuracies first.

115. The complaint reported that Defendant does not conduct manual regression tests of each payment feature on every release, and that doing so would be more expensive than building the automated regression tests for the feature.

116. The complaint reported Plaintiff's understanding that the deadline for the Plaid integration was driven by Defendant's desire to avoid renewing a year-long service contract with Yodlee.

117. Plaintiff filed his complaint with the Bureau characterizing Defendant's test-and-release policy as "reckless." Plaintiff chose that term aware that, under 12 U.S.C. § 5565(c)(2), reckless violations are subject to higher civil money penalties than other violations.

118. Plaintiff's report provided the Bureau information available only from inside Defendant's quality assurance function: that the defects consumers reported arose from Defendant's test and release policy, and that Defendant continued that policy after the August 2024 incident demonstrated its consequences. In the same complaint, Plaintiff reported that the fix for the August 2024 defect was pushed to production on September 6, 2024.

**B. Employer Knowledge**

119. Plaintiff's objections were made repeatedly and to multiple recipients, including members of Defendant's management, and were not limited to the objections concerning the DCash ACH (Plaid) directive, all as alleged in this Complaint. This Section alleges additional facts bearing on Defendant's knowledge of Plaintiff's protected activity.

120. Roman Wroclowski, a participant in the August 2024 engineering standup discussions, knew of Plaintiff's prior objections to releasing new features to consumers before their feature-specific automated regression tests were built and completed.

121. Plaintiff transmitted written warnings via Slack, directly to management and to the Plaid integration team, regarding the mandated test policy that delayed automated testing for the new DCash ACH pipeline (Plaid).

122. Dennis Carlos's knowledge was specific to Plaintiff: in the same directive deferring the feature's automated tests until after release, Dennis Carlos memorialized in writing his intent to enforce the "no automation til after" release policy "Especially with Jon," directly identifying Plaintiff as the focus of the directive, as alleged in The Test and Release Policy subsection above.

123. Director of Engineering Brandon Haller's question to Plaintiff, during the call on or around October 11, 2024, asking whether the test and release policy was illegal, is as alleged in the Protected Activity section above.

124. In its September 24, 2025 submission to OSHA, quoted in the Contributing Factor section below, Defendant stated: "During his employment, Mr. Beacher had to be coached at times to run manual testing, instead of relying solely on automated testing. The resulting delays impacted productivity, which factored into his selection for layoff when compared to the nonsupervisory coworker who was retained." The conduct Defendant describes as requiring coaching, and as causing the delays it says factored into Plaintiff's selection for

layoff, is the same conduct alleged above as Plaintiff's objections to Defendant's test and release policy.

125. On March 2, 2026, Defendant submitted an official position statement to the California Department of Industrial Relations, Labor Commissioner's Office, stating that "manual testing is non- negotiable." In the same filing, Defendant described Plaintiff's "departure from Domuso's testing policy – which everyone else followed."

126. In the same filing, Defendant stated that Plaintiff "disagreed with the wisdom of manual testing," demonstrated an "unwillingness to follow Domuso's quality assurance testing protocol," and was "openly ignoring his supervisor's repeated directives to manually test things."

127. In an April 24, 2026 submission to OSHA, Defendant stated "[a]t the time of his termination, Respondent advised Mr. Beacher he was selected due to financial concerns. Following the initiation of this investigation, Respondent clarified that Mr. Beacher's specific selection was driven by (among other things) his habit of logjamming Respondent's non-negotiable application testing process."

**C. Adverse Action**

128. Defendant terminated Plaintiff's employment on February 11, 2025. CTO Jose Godinez and CFO Bryan Babineau authorized the termination, as alleged above.

129. Director of Engineering Brandon Haller and CFO Bryan Babineau conducted the termination call.

130. On the same date, Defendant delivered to Plaintiff the written Notice of Change of Employment Status quoted in the Preliminary Statement section above.

131. Neither the termination call nor the Notice identified the criterion by which Plaintiff was selected for the layoff. In an April 24, 2026 submission to

OSHA, Defendant stated "[a]t the time of his termination, Respondent advised Mr. Beacher he was selected due to financial concerns. Following the initiation of this investigation, Respondent clarified that Mr. Beacher's specific selection was driven by (among other things) his habit of logjamming Respondent's non-negotiable application testing process."

132. On February 11, 2025, Defendant laid off four employees: Plaintiff, a QA Engineer; Rachel Bankston, a Senior Business Development Representative; Andy Jankowski, a Vice President of National Accounts; and Ardalan Razavi, a Senior Software Engineer.

**D. Contributing Factor**

133. In its September 24, 2025 submission to OSHA, Defendant stated: "During his employment, Mr. Beacher had to be coached at times to run manual testing, instead of relying solely on automated testing. The resulting delays impacted productivity, which factored into his selection for layoff when compared to the nonsupervisory coworker who was retained." In the same paragraph, Defendant stated: "His alleged complaint to the CFPB was not (and could not have been) a factor in the decision."

134. In the same September 24, 2025 submission, Defendant stated: "Mr. Beacher was part of the Quality Assurance ('QA') group within the Technology Department."

135. On information and belief, Director of Engineering Brandon Haller participated in or provided input on one or more of the following: the determination, stated in Defendant's September 24, 2025 submission to OSHA, that "the QA group needed only two employees to provide adequate QA coverage"; the selection of which members of the Quality Assurance group would be retained and which would be selected for the February 11, 2025 reduction in force; or the selection of Technology Department personnel for that reduction in

force. Both Technology Department employees selected—Plaintiff, a QA Engineer, and Ardalan Razavi, a Senior Software Engineer—held positions within the department of which Brandon Haller was Director of Engineering; the other two employees selected held sales and business-development roles, as alleged above. That belief further rests on the following facts: CTO Jose Godinez and CFO Bryan Babineau authorized the termination, as alleged above, yet CTO Jose Godinez did not conduct the termination call; Director of Engineering Brandon Haller conducted it, together with CFO Bryan Babineau. Brandon Haller was hired in or around August 2024, and was a recipient of Plaintiff's objection to the test and release policy, and asked Plaintiff whether that policy was illegal, on the call on or around October 11, 2024 alleged in the Protected Activity section above.

136. Plaintiff's protected activity was also proximate in time to his termination. On or around October 11, 2024, Plaintiff objected to Defendant's test and release policy on a call with Director of Engineering Brandon Haller, who asked Plaintiff whether that policy was illegal, and on the same day Plaintiff filed his whistleblower complaint with the Consumer Financial Protection Bureau, both as alleged in the Protected Activity section above. Defendant terminated Plaintiff's employment four months later, on February 11, 2025. Plaintiff further objected to the policy repeatedly and continuously throughout his employment, including, but not limited to, in writing over Defendant's internal Slack workspace in late September 2024, as alleged above.

137. In an April 24, 2026 submission to OSHA, Defendant stated that "Mr. Beacher's specific selection was driven by (among other things) his habit of logjamming Respondent's non-negotiable application testing process."

**E. Clear and Convincing Evidence**

138. This Section is governed by the legal burdens of proof specified in 12

U.S.C. § 5567(c)(3)(C), made applicable to this de novo action by § 5567(c)(4)(D)(ii) and quoted in the Exhaustion of Administrative Remedies section above: once Plaintiff demonstrates that his protected activity was a contributing factor in the unfavorable personnel action, relief may not be denied unless Defendant demonstrates by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that activity. This Section alleges facts bearing on that demonstration.

139. In its September 24, 2025 submission to OSHA, Defendant stated: “Mr. Beacher was part of the Quality Assurance ('QA') group within the Technology Department. As part of the restructuring, the Company decided the QA group needed only two employees to provide adequate QA coverage. Mr. Beacher's supervisor and another employee who had both longer tenure and better performance metrics than Mr. Beacher were retained. In addition, Domuso retained a contract employee with specialized experience and domain knowledge. Including Mr. Beacher, a total of four employees were laid off.”

140. On March 31, 2026, the OSHA investigator in Case No. 301059066 requested that Defendant provide, by April 10, 2026: performance evaluations of the retained employee described as having had better performance than Plaintiff; documentation showing that the retained employee had more tenure than Plaintiff; documentation showing that the retained contract employee had specialized experience and domain knowledge that Plaintiff did not have; and any other documentation showing how the decision to lay off employees was made. Defendant requested an extension of time to respond, and the deadline was extended to April 24, 2026.

141. In findings issued May 18, 2026 in OSHA Case No. 301059066, the Secretary of Labor stated that “four employees from Complainant's team were laid off including Complainant.”

142. The four employees selected in the February 11, 2025 reduction in

force, as alleged in the Adverse Action section above, did not comprise a single team or department: Plaintiff was the only Quality Assurance employee selected, two of the other three held sales and business-development roles, and the third was a software engineer. QA Engineer Alex Sohn, contract QA Engineer Shraddha V., and Senior QA Engineer Dennis Carlos were not selected in the February 11, 2025 reduction in force, and, on information and belief, each remains employed by or engaged with Defendant.

**Alex Sohn**

143. In its September 24, 2025 submission to OSHA, quoted above, Defendant stated that "another employee who had both longer tenure and better performance metrics than Mr. Beacher" was retained. The employee so described is QA Engineer Alex Sohn, as alleged in the Relevant Personnel subsection above. Alex Sohn did not have longer tenure than Plaintiff, as alleged in the Relevant Personnel subsection above. On April 24, 2026, Defendant stated that the selection for the reduction in force was "not primarily premised on his relative tenure or certifications."

144. Alex Sohn's 2024 Annual Performance Review, authored by Senior QA Engineer Dennis Carlos on December 31, 2024, rated Alex Sohn "Exceptional" with an overall manager score of 4.3—approximately four and a half months after the August 17, 2024 consumer-facing defect involving the Rewards feature that Alex Sohn had tested and approved, as alleged above, and covering at most approximately ten months of employment since his March 2024 rehire. In his own written 2024 review, Alex Sohn stated: "I need to improve time management for working on important but not urgent projects such as test automation." In its April 24, 2026 submission to OSHA, Defendant stated that "the retained employee's performance review was authored on December 31, 2024, nine months before the reduction in force was implemented." The

December 31, 2024 review was in fact authored approximately six weeks before the February 11, 2025 reduction in force.

145. Plaintiff's 2024 Annual Performance Review, authored by the same reviewer, Dennis Carlos, on the same date, and evaluating a full year of work, assigned Plaintiff an overall manager score of 2.5, with Dennis Carlos writing that he wanted "more attention to manual testing" and characterizing automated test scripting as running counter to work quality—the same conduct alleged in the Protected Activity section above as Plaintiff's objections to Defendant's test and release policy. Dennis Carlos also noted repeatedly in the review that he had not asked Plaintiff to work on automated scripting; Plaintiff's formal job description, however, required "Test Script Automation writing and Execution (Python, Selenium, RobotFramework, GitHub, CircleCI)."

146. In its March 2, 2026 position statement to the California Department of Industrial Relations, Labor Commissioner's Office, Defendant stated that "[f]rom the outset of his employment, Mr. Beacher experienced difficulties with his role." On or around February 15, 2023, approximately one year after hiring Plaintiff, Defendant raised Plaintiff's annual salary from $110,000 to $120,000, communicated to Plaintiff in writing by his direct supervisor as a performance-based merit raise, as alleged in the Parties section above. Defendant continued to employ Plaintiff for two years after that increase. In or around March 2024, Defendant rehired Alex Sohn as a QA Engineer, approximately eleven months before selecting Plaintiff for the February 11, 2025 reduction in force.

147. Defendant rehired Alex Sohn in or around March 2024 at a starting base salary of $120,000 per year, and, on information and belief, Plaintiff and Alex Sohn were paid the same annual base salary at the time of the February 11, 2025 layoff, so that retaining Alex Sohn instead of Plaintiff produced no cost saving. Defendant's written Notice of Change of Employment Status cited "the Company's need to keep costs down," as alleged in the Preliminary Statement

section above.

**Dennis Carlos**

148. Senior QA Engineer Dennis Carlos performed the same hands-on individual-contributor QA work as the other QA Engineers on the team, as alleged in the Relevant Personnel subsection above, yet Defendant did not include Dennis Carlos in the group from which Plaintiff was selected: in its September 24, 2025 submission to OSHA, quoted above, Defendant stated: "During his employment, Mr. Beacher had to be coached at times to run manual testing, instead of relying solely on automated testing. The resulting delays impacted productivity, which factored into his selection for layoff when compared to the nonsupervisory coworker who was retained."

149. In the same September 24, 2025 submission, Defendant stated that "Mr. Beacher's supervisor," together with the other retained employee, "had both longer tenure and better performance metrics than Mr. Beacher"; on April 24, 2026, Defendant stated that the selection was "not primarily premised on his relative tenure or certifications." Defendant has identified no contemporaneous performance evaluation of Dennis Carlos in any of its submissions provided to Plaintiff; the only performance evaluations of Quality Assurance personnel identified in Defendant's submissions provided to Plaintiff are the 2024 Annual Performance Reviews of Plaintiff and Alex Sohn, both authored by Dennis Carlos.

150. On December 19, 2024, Plaintiff submitted PTO requests including four separate weeks in January 2025, each submitted more than two weeks in advance as required by Defendant's Flexible Paid Time Off ("Flexible PTO") policy. Senior QA Engineer Dennis Carlos denied all four compliant January requests in written Slack messages, stating as the ground for the denials, in substance, that critical business needs required Plaintiff's continuous presence. On

March 2, 2026, in its position statement to the Labor Commissioner, Defendant represented that "Domuso has never denied or discouraged a single request from Mr. Beacher for time off, and there is no document or witness proving otherwise." The written Slack messages denying the January 2025 requests are within Defendant's possession, custody, and control.

151. Less than six weeks after those denials—whose stated ground was that critical business needs required Plaintiff's continuous presence—Defendant terminated Plaintiff's employment, and in its September 24, 2025 submission to OSHA, quoted above, stated that "the QA group needed only two employees to provide adequate QA coverage" without Plaintiff.

152. In its September 24, 2025 submission to OSHA, Defendant stated that the QA group needed only two employees to provide adequate QA coverage, as alleged above. In the same month, Defendant posted a job opening for a "Tier 2 Customer Support Specialist" to "handle escalated issues," to "[t]roubleshoot software and technical issues," and to respond to inquiries from customers and clients, working with property management staff and "residents using the Domuso platform," and, on information and belief, hired for that position. A copy of the posting is in Plaintiff's possession.

**The Contract QA Engineer (Shraddha V.)**

153. In its September 24, 2025 submission to OSHA, quoted above, Defendant stated that it retained "a contract employee with specialized experience and domain knowledge"; the contract employee so described is the contract QA Engineer Shraddha V., as alleged in the Relevant Personnel subsection above. The OSHA investigator's March 31, 2026 request, alleged above, sought documentation showing that the retained contract employee had specialized experience and domain knowledge that Plaintiff did not have. No such documentation or evidence, and no performance evaluation of the contractor,

appears in any submission or record provided to Plaintiff, including in response to that request. In 2024, Dennis Carlos wrote that "technically Jon could move better on it. He's worked on some of the Yodlee implementations, whereas Shraddha has not really."

**The Colorado Attorney General Investigation**

154. The State of Colorado began investigating Domuso on or around October 22, 2024, as stated in the Final Consent Judgment quoted in the Relevant Personnel subsection above. That investigation was therefore underway approximately three and a half months before the February 11, 2025 termination.

155. The Final Consent Judgment directs that notices to Domuso under that judgment be sent to Domuso in care of Ronald Cheng of Pillsbury Winthrop Shaw Pittman LLP in Los Angeles, California. On information and belief, Defendant retained that firm to represent it in connection with the Colorado Attorney General's investigation, and incurred legal fees for that representation.

156. In the Final Consent Judgment, Domuso represented that it "is financially solvent as of the Effective Date and has the present ability to comply with all of its obligations" under that judgment, represented that its financial disclosures provided to the State of Colorado were complete and accurate as of the date of the disclosures, and agreed to pay the State of Colorado one hundred thousand dollars ($100,000) within thirty days of the Effective Date.

157. Domuso's financial condition between February 11, 2025 and the Effective Date of the Final Consent Judgment, including the financial disclosures referenced in the preceding paragraph, is within Defendant's possession, custody, and control.

**The Stated Reason for the Reduction in Force**

158. On the termination call on February 11, 2025, Defendant told Plaintiff

that his position was being eliminated as part of a company restructuring driven by financial constraints, and on the same date delivered the written Notice quoted in the Preliminary Statement section above, which stated that "due to the Company's revenues not reaching forecasted goals, market impacts have resulted in financial constraints at the Company," and cited "the Company's need to keep costs down."

159. In December 2024, approximately six weeks before the February 11, 2025 reduction in force, Defendant hired Nicole House as Customer Success Manager.

160. In September 2025, Defendant posted and, on information and belief, filled a Tier 2 Customer Support Specialist position, as alleged above.

161. The February 11, 2025 written Notice of Change of Employment Status, captioned "Notice of Layoff Due to Company Restructuring" and quoted in the Preliminary Statement section above, did not reference the Colorado Attorney General's investigation or the cost of responding to it.

162. In its April 24, 2026 submission to OSHA, Defendant stated "[a]t the time of his termination, Respondent advised Mr. Beacher he was selected due to financial concerns. Following the initiation of this investigation, Respondent clarified that Mr. Beacher's specific selection was driven by (among other things) his habit of logjamming Respondent's non-negotiable application testing process." In the same submission, Defendant stated that Plaintiff's "selection was chiefly driven by his lasting performance-related issues (as described in Respondent's earlier submissions to the Department)."

**Bryan Babineau**

163. CFO Bryan Babineau overrode Senior QA Engineer Dennis Carlos's denials of Plaintiff's January 2025 paid time off requests and approved a single week in January 2025 that Plaintiff requested again — the only leave Plaintiff

took under Defendant's Flexible Paid Time Off ("Flexible PTO") policy between April 2023 and his termination — and invited Plaintiff to submit further requests.

164. In or around January 2025, Plaintiff submitted paid time off requests for dates in March, April, May, and June 2025. Each was approved in writing. Each fell after February 11, 2025. Under Defendant's Flexible Paid Time Off ("Flexible PTO") policy, "[t]here will be no compensation for paid time off upon termination of employment, unless otherwise required by law."

165. Bryan Babineau authorized the termination and, with Director of Engineering Brandon Haller, conducted the termination call. Defendant has not identified when the decision to conduct the February 11, 2025 reduction in force, or the decision to select Plaintiff for it, was made.

166. In its March 2, 2026 position statement, Defendant stated that "the record evidences Mr. Beacher's flouting several company policies (repeatedly and without improvement), including those related to automated testing, chain-of-command, open communication, and leave requests." Defendant's Employee Handbook provided to Plaintiff during his employment contains an Open Door Policy providing that all employees "may express ideas and opinions directly to Company management" and "are always welcome to send an email or make a call to Human Resources."

**Michael Lightfoot**

167. In a press release distributed through PRWeb on October 13, 2021, approximately four months before Plaintiff was hired, Domuso CEO Michael Lightfoot stated that the company would "scale in a way that keeps our quality of service and support at the highest levels." A copy of the publication is in Plaintiff's possession.

168. In 2022, Plaintiff met in person with CEO Michael Lightfoot at Defendant's Santa Monica office, in accordance with Defendant's Open Door

Policy, as alleged in the Protected Activity section above. In substance, Plaintiff told Michael Lightfoot that product and marketing teams were consistently rushing releases and pressuring for QA approval, and that automated regression tests needed to be passing. Michael Lightfoot told Plaintiff, in substance, that releasing features as fast as possible was the job of the product and marketing teams, that ensuring quality was Plaintiff's job, and that Plaintiff should do his job.

169. In its March 2, 2026 position statement to the California Department of Industrial Relations, Labor Commissioner's Office, Defendant stated that "code changes inevitably create issues in other, pre-existing areas of the program," described automated testing as "a highly expensive endeavor" that generates no revenue, and stated that it "could not afford to hemorrhage resources" into Plaintiff's automation work.

170. Defendant has since characterized Plaintiff's conduct with respect to its testing process as a "habit of logjamming," as alleged in the Protected Activity section above.

**F. Severance Agreement**

171. On February 11, 2025, the day of termination, Defendant presented Plaintiff with a Confidential Separation and Release Agreement drafted by Defendant, offering a severance payment of $6,923, equal to three weeks of base salary. Plaintiff signed on or about February 25, 2025, without counsel.

172. Section 9 of the Agreement enumerates the federal and state statutes under which claims are released, naming, among others, the Sarbanes-Oxley Act of 2002 and the Texas Whistleblower Act. Section 9 does not name the Consumer Financial Protection Act or 12 U.S.C. § 5567. Section 9 releases the claims listed in its clause (i) "to the extent legally permitted," extends by catch-all only to claims "that may be legally waived and released," and states that the release

"excludes any claims that cannot be waived by law."

173. Under 12 U.S.C. § 5567(d)(1), "[e]xcept as provided under paragraph (3), and notwithstanding any other provision of law, the rights and remedies provided for in this section may not be waived by any agreement, policy, form, or condition of employment, including by any predispute arbitration agreement."

174. Plaintiff alleges that his claim under § 5567 was not and could not be released by the Agreement.

175. The exception in 12 U.S.C. § 5567(d)(3) applies only to arbitration provisions contained in a collective bargaining agreement. Plaintiff was not employed under a collective bargaining agreement, and no agreement at issue in this action is or contains a collective bargaining agreement.

**G. Arbitration Provision**

176. On or around February 3, 2022, Defendant presented Plaintiff with an offer letter drafted by Defendant containing a provision titled "Voluntary Agreement to Arbitrate," providing that "any disputes or controversies of any nature whatsoever" arising from or relating to Plaintiff's employment or its termination "shall be resolved by confidential, binding arbitration." Plaintiff signed on or around February 3, 2022; Defendant countersigned on or around February 4, 2022. The termination giving rise to this action occurred on February 11, 2025.

177. Section 18 of the February 2025 Separation Agreement, titled "Voluntary Agreement to Arbitrate," provides that "any claim or dispute arising out of or relating to the terms of this Agreement" shall be submitted to arbitration under the employment arbitration rules of the Judicial Arbitration & Mediation Services, Inc. This action does not arise out of or relate to the terms of that Agreement. It arises under 12 U.S.C. § 5567 from Defendant's termination of Plaintiff's employment on February 11, 2025, which occurred before that

Agreement was presented or executed. Plaintiff alleges that, by its terms, Section 18 does not extend to this action.

178. Each provision was executed before any dispute arising under 12 U.S.C. § 5567 existed between the parties. Plaintiff alleges that each is a predispute arbitration agreement within the meaning of 12 U.S.C. § 5567(d)(2). In an April 24, 2026 submission to OSHA, Defendant stated "[a]t the time of his termination, Respondent advised Mr. Beacher he was selected due to financial concerns. Following the initiation of this investigation, Respondent clarified that Mr. Beacher's specific selection was driven by (among other things) his habit of logjamming Respondent's non-negotiable application testing process."

179. Under 12 U.S.C. § 5567(d)(2), "[e]xcept as provided under paragraph (3), and notwithstanding any other provision of law, no predispute arbitration agreement shall be valid or enforceable to the extent that it requires arbitration of a dispute arising under this section."

180. Plaintiff alleges that each provision identified above, including any rule incorporated by reference that would assign the determination of arbitrability to an arbitrator, is invalid and unenforceable as to this action. Neither agreement is or contains a collective bargaining agreement, and the exception in § 5567(d)(3) does not apply.

181. Section 17 of the Separation Agreement, drafted by Defendant, provides: "Any dispute arising hereunder shall be brought only in the federal and state courts of the Applicable State and no other courts and each party hereby consents to the exclusive jurisdiction of such courts."

## CLAIMS

**CLAIM I - RETALIATION IN VIOLATION OF THE CONSUMER FINANCIAL PROTECTION ACT (12 U.S.C. § 5567)**

182. Plaintiff realleges and incorporates by reference all preceding paragraphs.

183. Defendant is a covered person within the meaning of 12 U.S.C. §§ 5567 and 5481(6)(A), as alleged above.

184. Plaintiff was a covered employee within the meaning of 12 U.S.C. § 5567(b), as alleged above.

185. Plaintiff's claim under 12 U.S.C. § 5567 is not subject to waiver, as alleged above.

186. Plaintiff's claim under 12 U.S.C. § 5567 is not subject to any predispute arbitration agreement, and no arbitration provision extends to or is enforceable as to this action, as alleged above.

187. This action is governed by the legal burdens of proof specified in 12 U.S.C. § 5567(c)(3). Under § 5567(c)(4)(D)(ii), "[a] proceeding under clause (i) shall be governed by the same legal burdens of proof specified in paragraph (3)." Under § 5567(c)(3)(C), "[t]he Secretary of Labor may determine that a violation of subsection (a) has occurred only if the complainant demonstrates that any behavior described in paragraphs (1) through (4) of subsection (a) was a contributing factor in the unfavorable personnel action alleged in the complaint. Relief may not be ordered under subparagraph (A) if the employer demonstrates by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of that behavior." Plaintiff accordingly alleges his protected activity, Defendant's knowledge of it, the adverse action, its contributing-factor causation, and the absence of clear and convincing evidence that Defendant would have taken the same action, in the paragraphs that follow.

188. Plaintiff engaged in protected activity under 12 U.S.C. § 5567(a)(4),

which protects an employee who has "objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee (or other such person) reasonably believed to be in violation of any law, rule, order, standard, or prohibition, subject to the jurisdiction of, or enforceable by, the Bureau." Plaintiff objected to Defendant's test and release policy—its policy of releasing financial features to consumers before building and completing their feature-specific automated regression tests—repeatedly, as set forth above. Those objections were made repeatedly and to multiple recipients, including members of Defendant's management, all as alleged above, and included, but were not limited to: Plaintiff's written objection over Defendant's internal Slack workspace to the DCash ACH (Plaid) directive in late September 2024; the call with Director of Engineering Brandon Haller on or around October 11, 2024; and Plaintiff's complaint to the Consumer Financial Protection Bureau on or around October 11, 2024. As to the DCash ACH (Plaid) directive, Plaintiff performed the directed manual testing, granted QA approval, and the feature was released on or around Defendant's October 15, 2024 deadline, notwithstanding his objections, as alleged above. Plaintiff's objection to that directive was made and maintained while he performed the task directed and met the release date set by Defendant.

189. In the alternative, to the extent Defendant's own descriptions of Plaintiff's conduct are accepted as true, that conduct constituted a refusal to participate in Defendant's test and release policy within the meaning of § 5567(a)(4). Manual testing was not itself the activity, policy, practice, or assigned task Plaintiff believed unlawful; the activity, policy, practice, or assigned task objected to was the sequencing under which QA approval gated release before a feature's automated regression tests were built and completed, as alleged above. Defendant describes Plaintiff as having departed from its testing policy, as having required coaching to run manual testing rather than relying on automated testing, as, in its March 2, 2026 position statement, "flouting several company policies

(repeatedly and without improvement), including those related to automated testing," and, in its April 24, 2026 submission to OSHA, as having a habit of logjamming its non-negotiable application testing process, all as alleged above.

190. Plaintiff also engaged in protected activity under 12 U.S.C. § 5567(a)(1), which protects an employee who has "provided, caused to be provided, or is about to provide or cause to be provided, information to the employer, the Bureau, or any other State, local, or Federal, government authority" relating to any act or omission the employee reasonably believes to be a violation of any law, rule, order, standard, or prohibition subject to the jurisdiction of, or enforceable by, the Bureau. Plaintiff provided such information to Defendant and to the Bureau, as alleged in the Protected Activity section above. The Bureau complaint expressly urged the Bureau to investigate potential violations of regulations governing payment processing and financial record-keeping, as alleged above.

191. Section 5531 of Title 12 empowers the Bureau to prevent unfair, deceptive, or abusive acts or practices.

192. Under 12 U.S.C. § 5531(c)(1), an act or practice is unfair if it causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers and is not outweighed by countervailing benefits to consumers or to competition.

193. Under 12 U.S.C. § 5531(d)(2), an act or practice is abusive if it takes unreasonable advantage of a consumer's lack of understanding of the material risks, costs, or conditions of the product or service; the consumer's inability to protect his or her interests in selecting or using a consumer financial product or service; or the consumer's reasonable reliance on a covered person to act in his or her interests.

194. Deception is not defined by statute. Plaintiff understood a practice to be deceptive within the meaning of 12 U.S.C. § 5531 if it involved a

representation, omission, or practice likely to mislead a consumer acting reasonably under the circumstances, as to a matter material to the consumer's decision or conduct.

195. Plaintiff alleges the beliefs set forth below by reference to these standards, and alleges that those beliefs were reasonable; he does not allege that the Bureau has made any determination. Nor does Plaintiff allege that the financial injury risked by the DCash ACH (Plaid) release materialized; the beliefs alleged below concerned the risk the policy created, and their reasonableness is alleged as of the time of Plaintiff's objections and report. Among the facts alleged above bearing on that reasonableness: Plaintiff encountered the reports alleged in The KRNV News 4 Reports subsection above in July 2023, as alleged in the Plaintiff's Objections subsection above; before Plaintiff's complaint to the Bureau, Domuso's Director of Payments questioned, in substance, the legality of manually modifying Domuso's production database to correct the Rewards records, as alleged in The August 2024 Consumer Data Incident subsection above; and, upon receiving Plaintiff's objection on the call on or around October 11, 2024, Director of Engineering Brandon Haller asked Plaintiff whether the policy was illegal, as alleged in the Protected Activity section above.

196. Plaintiff reasonably believed the test and release policy, as alleged in The Test and Release Policy subsection above, was an unfair act or practice under 12 U.S.C. § 5531. Plaintiff believed the policy caused or was likely to cause substantial financial injury to consumers, including but not limited to the consumer financial injury alleged in The August 2024 Consumer Data Incident subsection above, and, especially as to the DCash ACH (Plaid) pipeline released under the policy, financial injury of the type and magnitude alleged in The KRNV News 4 Reports subsection above, as Plaintiff understood in the Plaintiff's Objections subsection above. Plaintiff believed the financial injury was not reasonably avoidable by consumers, for the reasons alleged in the Background

section, Domuso's Terms of Service section, The KRNV News 4 Reports subsection, and The August 2024 Consumer Data Incident subsection above. Plaintiff believed the financial injury was not outweighed by countervailing benefits to consumers or to competition, for the reasons alleged in The Role of Automated Testing and The Test and Release Policy subsections above. That belief rested on the information then known to Plaintiff, as alleged above.

197. Plaintiff also reasonably believed the policy was abusive under 12 U.S.C. § 5531(d)(2)(B) and (d)(2)(C): that it took unreasonable advantage of consumers' inability to protect their interests in selecting or using the service, for the reasons alleged in the Background section, Domuso's Terms of Service section, and The KRNV News 4 Reports subsection above, and of consumers' reasonable reliance on Defendant to record their rent payments accurately, because Defendant's records determine whether a tenant's rent is recorded as paid, the late fees and insufficient-funds charges assessed against a tenant follow from those records, as alleged above, and amounts Defendant's records treat as delinquent may be sent to collections, as alleged in the Defendant Domuso, Inc. section above and as reported in The KRNV News 4 Reports subsection above.

198. Plaintiff also reasonably believed the policy was deceptive within the meaning of 12 U.S.C. § 5531. Defendant's platform displays to each consumer the record of that consumer's own payments and account history, as alleged in the Background section above; Plaintiff believed that, under the policy, a defect introduced after a feature's release could render that displayed record wrong without detection by Defendant, so that the display was likely to mislead a consumer acting reasonably as to a matter material to the consumer's conduct, as occurred in the incident alleged in The August 2024 Consumer Data Incident subsection above and as reported in The KRNV News 4 Reports subsection above.

199. Plaintiff also reasonably believed that the consumer injury the policy

risked was aggravated by Defendant's Terms of Service, as alleged in Domuso's Terms of Service section above. The provisions so alleged are the finality provision of Section 1.2(vii) of the Terms of Service and the consumer-responsibility and dispute provisions of Section 1.2(ix), quoted in that section. Plaintiff understood those provisions to be the reason a defect of the kind the test and release policy permitted would produce a charge the consumer could not correct: a payment recorded wrongly was, by the Terms' own operation, final, the consumer's own responsibility to have verified, and disputable only against the landlord. Defendant's Terms of Service gave a consumer no right to obtain correction of Defendant's records; correction depended instead on Defendant electing to alter its own production database manually, and in the December 17, 2024 amendment Defendant added to the Rewards Program section the sentence beginning “Qualifying activities” quoted in that section, all as alleged above.

200. Plaintiff further reasonably believed the test and release policy was inconsistent with Regulation E, 12 C.F.R. Part 1005, a rule prescribed by the Bureau. Plaintiff understood the rental payments Defendant processes by eCheck/ACH debit, by AutoPay, and by scanned paper check converted into ACH transactions to be electronic fund transfers governed by that regulation, based on Defendant's own characterizations quoted in the Electronic Fund Transfers subsection above and in Domuso's Terms of Service section above. Under the policy, the software executing those transfers was released to consumers before the automated regression tests capable of detecting a later break in it were built and completed, and Plaintiff's quality assurance approval gated that release. Plaintiff's belief that the policy was inconsistent with Regulation E rested on that sequencing: Regulation E's error-resolution provisions address errors in electronic fund transfers, and the policy released the software executing those transfers with no automated mechanism to detect a defect that a subsequent deployment introduced, so that erroneous transfers could occur and persist without detection

by Defendant. Plaintiff further understood that a consumer had no contractual path to correction of such an error: Defendant's Terms of Service contained the Regulation E compliance statement quoted in Domuso's Terms of Service section above while containing, in the same document, the provisions of Sections 1.2(iv) and 1.2(vii) quoted in that section; and that the Electronic Fund Transfer Act's anti-waiver provision, 15 U.S.C. § 1693l, provides that no writing may waive any right conferred by that Act. For consumers who paid by credit card, Plaintiff understood that the no-chargeback provision applied by its terms to card payments while Regulation Z, 12 C.F.R. Part 1026 — also a rule prescribed by the Bureau — confers billing-error and chargeback rights against the card issuer, as alleged in the Card Payments subsection above; Plaintiff tested the card payment flow during his employment. Plaintiff's belief did not require resolving whether Regulation E's compliance obligations fell on Defendant or on its bank partners.

201. Plaintiff alleges these beliefs in support of the reasonableness of his protected activity under 12 U.S.C. § 5567(a), and does not assert a standalone claim under the Electronic Fund Transfer Act or 15 U.S.C. § 1693l, or under the Truth in Lending Act or Regulation Z. Plaintiff does not allege that he objected to Defendant's Terms of Service as a separate practice, or that his internal objections or his report to the Bureau identified those Terms as the practice objected to. Plaintiff does allege, as set forth above, that his report to the Bureau raised potential violations of regulations governing payment processing and financial record-keeping. Plaintiff alleges his knowledge of the Terms only as bearing on the reasonableness of his belief concerning the test and release policy: the Terms are the reason a defect permitted by that policy would produce a consumer charge that could not be corrected. Plaintiff alleges the provisions of the Terms of Service described in the preceding paragraphs as information known to him bearing on that reasonableness, and not as an allegation that Defendant's Terms of

Service violated any provision of law.

202. In its March 2, 2026 position statement, Defendant stated that "code changes inevitably create issues in other, pre-existing areas of the program," described automated testing as "a highly expensive endeavor" that generates no revenue, and stated that it "could not afford to hemorrhage resources" into Plaintiff's automation work; Defendant has identified no benefit to consumers or competition from deferring a feature's automated regression tests until after its release to consumers.

203. Defendant knew of Plaintiff's protected activity, as alleged in the Employer Knowledge section above.

204. Defendant took adverse employment action against Plaintiff by terminating his employment on February 11, 2025, as alleged in the Adverse Action section above.

205. Plaintiff's protected activity was a contributing factor in Defendant's decision to terminate him, as alleged in the Contributing Factor section above.

206. Defendant cannot demonstrate by clear and convincing evidence that it would have taken the same action in the absence of that protected activity, as alleged in the Clear and Convincing Evidence section above.

207. Defendant's successive explanations for selecting Plaintiff for termination are as alleged in the Clear and Convincing Evidence section above.

208. Defendant thereby violated the anti-retaliation provisions of the Consumer Financial Protection Act, 12 U.S.C. § 5567. As a direct and proximate result, Plaintiff has suffered and continues to suffer damages, including lost wages and benefits, and other harm to be proven at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court exercise its jurisdiction under 12 U.S.C. § 5567(c)(4)(D) and 29 C.F.R. § 1985.114(c) to grant

all relief necessary to make Plaintiff whole, including injunctive relief and compensatory damages, and enter judgment in his favor and against Defendant awarding the following:

A. Reinstatement with the same seniority status that Plaintiff would have had, but for the discharge or discrimination; or, in the alternative, front pay in lieu of reinstatement;

B. The amount of back pay, with interest, including all lost wages, benefits, and compensation;

C. Compensation for special damages sustained as a result of the discharge, including compensatory damages for garden variety emotional distress, in an amount to be proven at trial. Plaintiff expressly does not claim any specific psychiatric injury, severe emotional distress, or medical expenses, and does not put his medical or psychological condition in controversy;

D. Litigation costs, expert witness fees, and reasonable attorney fees, including fees incurred for attorney consultation or limited-scope legal services obtained in connection with this action at any stage, and, should Plaintiff retain counsel of record, reasonable attorney fees for that representation;

E. Injunctive relief and any other relief necessary to make Plaintiff whole; and

F. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable, pursuant to 12 U.S.C. § 5567(c)(4)(D)(i) and 29 C.F.R. § 1985.114(b), which provides that at the request of either party the action shall be tried by the court with a jury.

## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being

presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated: AUGUST 13, 2026

Respectfully submitted,

Jonathan Beacher

Jonathan Beacher
Plaintiff in Pro Se