# EXHIBIT 3

In re Bank of America, N.A., File No. 2022-CFPB-0004, Consent Order (July 14, 2022)

(Excerpts: pages 1, 9-12, 16-21)

**UNITED STATES OF AMERICA**
**CONSUMER FINANCIAL PROTECTION BUREAU**

ADMINISTRATIVE PROCEEDING
File No. 2022-CFPB-0004

| | |
|---|---|
| In the Matter of:<br><br>**BANK OF AMERICA, N.A.** | **CONSENT ORDER** |

The Consumer Financial Protection Bureau (Bureau) has reviewed the administration of unemployment insurance benefit prepaid debit cards by Bank of America, N.A. (Respondent, as defined below) and has identified the following law violations in connection with Respondent's treatment of unemployment insurance benefit recipients who filed notices of error concerning alleged unauthorized electronic fund transfers (EFTs): (1) Respondent engaged in unfair acts or practices by determining no error had occurred and freezing cardholder accounts based solely on the results of Respondent's automated Fraud Filter, in violation of Sections 1031 and 1036 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a) and (c), 5536(a)(1)(B); (2) Respondent failed to conduct reasonable investigations of unemployment insurance benefit prepaid

determine whether an error has occurred, and report the results of its investigation and determination to the consumer pursuant to the requirements in Sections 908 and 909 of EFTA, 15 U.S.C. §§ 1693f and 1693g, and Section 1005.11 of Regulation E.

12. From January 2020 until late-September 2020, upon receiving a notice of error from an unemployment insurance benefit prepaid debit cardholder concerning alleged unauthorized EFTs, Respondent would conduct an investigation that could include, among other steps: comparing the location of the transaction with the consumer's residence or habitual transactions; accessing ATM camera footage (if the alleged unauthorized activity occurred at a Respondent ATM); and contacting the cardholder for further information.

13. Following a surge in notices of error filed by unemployment insurance benefit prepaid debit cardholders nationwide throughout the summer of 2020, Respondent changed its practices for investigating unemployment insurance benefit prepaid debit cardholder notices of error.

14. Under its new strategy, which Respondent implemented on September 28, 2020 for all of its state unemployment insurance benefit prepaid programs, Respondent only ran cardholders' notices of error concerning alleged unauthorized EFTs through its newly developed automated Fraud Filter, and

for notices of error that met any indicator used by the Fraud Filter ceased taking the steps described in Paragraph 12, above, as part of its investigation.

15. Beginning on September 28, 2020, for notices of error submitted by unemployment insurance benefit prepaid debit cardholders concerning alleged unauthorized EFTs that met any of the three indicators used by Respondent's new Fraud Filter, Respondent automatically determined that no error had occurred.

16. Between September 28, 2020 and June 8, 2021, for notices of error submitted by unemployment insurance benefit prepaid debit cardholders concerning alleged unauthorized EFTs that met any of the three indicators used by Respondent's Fraud Filter, along with determining no error had occurred, Respondent froze or, after March 17, 2021, blocked the consumer's prepaid debit card account.

17. The only exception was from October 4, 2020 through December 2, 2020, when unemployment insurance benefit prepaid debit card accounts flagged by Respondent's new Fraud Filter were not frozen as Respondent had intended. After Respondent discovered the issue, it froze those flagged unemployment insurance benefit prepaid debit card accounts on or about December 17, 2020, excluding accounts where a reconsideration request

from a consumer was pending or where Respondent had reversed its initial determination that no error had occurred.

18. A consumer whose unemployment insurance benefit prepaid debit card account is frozen cannot access the government benefits in their account.

19. Respondent also will not accept new benefits payments for deposit into a frozen unemployment insurance benefit prepaid debit card account.

20. When Respondent blocks an unemployment insurance benefit prepaid debit card, no transactions are permitted. But unlike an account freeze, Respondent permits cardholders with blocks on their unemployment insurance benefit prepaid debit card to verify their identity directly with Respondent. Upon verification, Respondent releases the block, and the unemployment insurance benefit prepaid debit card becomes usable again.

21. Before implementing the Fraud Filter on September 28, 2020, Respondent knew, or should have known, that the Fraud Filter would, in certain cases, incorrectly determine that no error had occurred.

22. Likewise, before implementing the Fraud Filter, Respondent knew, or should have known, that not all unemployment insurance benefit prepaid accounts meeting its Fraud Filter indicators would be fraudulent and therefore should be frozen. Indeed, in an internal September 2020 presentation, Respondent acknowledged, "Fraudulent determinations would

require a detailed review of specific accounts, which given the volume, is unmanageable."

23. For notices of error meeting any of its Fraud Filter indicators, Respondent continued with its nationwide strategy of automatically determining no error occurred and freezing the cardholder's unemployment insurance benefit prepaid debit card account based solely on the Fraud Filter from September 28, 2020 to March 17, 2021.

24. Consumers whose unemployment insurance benefit prepaid debit card accounts Respondent froze through its Fraud Filter went weeks, and in some cases months, without access to their unemployment insurance benefits.

25. Some consumers whose prepaid debit card accounts Respondent froze incurred late fees and interest charges on their other accounts, and also missed phone and utility bill payments. Some consumers with frozen prepaid debit card accounts also faced other financial impacts, including foreclosure, eviction, and car repossession.

26. Beginning on March 18, 2021, for notices of error for which it determined no error had occurred based solely on the results of its Fraud Filter, Respondent blocked the cardholder's unemployment insurance benefit prepaid debit card, rather than freezing the cardholder's account.

**Findings and Conclusions as to Respondent's Strategy in California (Unfair Practice)**

40. Sections 1031 and 1036 of the CFPA prohibit a "covered person" from engaging in any "unfair, deceptive, or abusive act or practice" in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

41. An act or practice is unfair if it causes or is likely to cause substantial injury to consumers, which is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c).

42. From September 28, 2020 to March 17, 2021, Respondent automatically determined, without any further investigation, that no error had occurred for any EDD Cardholder notice of error concerning alleged unauthorized EFTs that met any of the three indicators in Respondent's Fraud Filter. During most of this period, when Respondent determined no error had occurred through its Fraud Filter, Respondent also froze the cardholder's EDD Prepaid Debit Card Account.

43. This caused substantial injury to consumers. Not only did Respondent, through its Fraud Filter, incorrectly and automatically determine no error had occurred for tens of thousands of EDD Cardholders who had filed

notices of error, but Respondent also froze those cardholders' EDD Prepaid Debit Card Accounts (except as stated in Paragraph 17), meaning those EDD Cardholders could not receive or access the unemployment insurance benefit funds in their Accounts.

44. This substantial injury was not reasonably avoidable by EDD Cardholders. During this period, Respondent generally required EDD Cardholders whose Accounts were frozen through its strategy to reverify their identity through EDD to regain access to their Accounts.

45. EDD Cardholders received conflicting and delayed information from Respondent regarding the reasons for their EDD Prepaid Debit Card Account freeze, and the steps they needed to take to unfreeze their Account.

46. This substantial injury was not outweighed by any countervailing benefits to consumers or to competition.

47. As a result, Respondent engaged in unfair acts or practices, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a) and (c), 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Retroactive Application of Its Fraud Filter (Abusive Practice)**

48. An act or practice is abusive if it, among other things, takes unreasonable advantage of the inability of a consumer to protect their interests in selecting or using a consumer financial product or service. 12 U.S.C. § 5531(d)(2)(B).

49. In late September 2020 or early October 2020, Respondent also applied its Fraud Filter to more than 11,000 notices of error concerning alleged unauthorized EFTs submitted by EDD Cardholders between April 1, 2020 and September 27, 2020 for which Respondent had previously provided the EDD Cardholder a permanent credit.

50. For those more than 11,000 notices of error, Respondent retroactively determined that no error had occurred based on the results of its Fraud Filter, and reversed those EDD Cardholders' permanent credits.

51. Affected EDD Cardholders were unable to protect their interests because they could not control how and when Respondent would investigate and resolve their notices of error.

52. Until at least December 2021, Respondent did not correct its reversals of these more than 11,000 previously-investigated-and-paid notices of error without an EDD Cardholder's request for reconsideration.

53. By reversing the permanent credits for EDD Cardholders who had already received notice from Respondent that their error claim had been investigated and paid, Respondent took unreasonable advantage of EDD Cardholders' inability to protect their interests.

54. As a result, Respondent engaged in abusive acts or practices, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a) and (d)(2)(B), 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Failure to Conduct Reasonable Error Resolution Investigations (EFTA and Regulation E)**

55. Under EFTA, upon receiving notices of error, financial institutions may not determine no error had occurred without conducting a "good faith investigation of the alleged error" and without "a reasonable basis for believing that the consumer's account was not in error." 15 U.S.C. § 1693f(e).

56. Further, under Regulation E, when conducting an Error Resolution Investigation, a financial institution must conduct, at minimum, a "review of its own records regarding [the] alleged error." 12 C.F.R. § 1005.11(c)(4), and the Error Resolution Investigation "must be reasonable," 71 Fed. Reg. 1638, 1654 (Jan. 10, 2006).

57. From September 28, 2020 to June 8, 2021, Respondent used its Fraud Filter to determine no error had occurred for approximately 188,000 notices of error submitted by Affected Consumers nationwide concerning alleged unauthorized EFTs, without any further investigation or considering any other information relevant to Affected Consumers' notices.

58. As a result, Respondent violated the requirement to conduct a reasonable Error Resolution Investigation under Sections 908 and 909 of EFTA, 15 U.S.C. §§ 1693f and 1693g, and Section 1005.11 of Regulation E.

**Findings and Conclusions as to Respondent Impeding EDD Cardholders from Filing Notices of Error and Seeking Liability Protection from Unauthorized EFTs (Unfair Practices)**

59. Throughout the Relevant Period, Respondent and EDD both directed EDD Cardholders to contact Respondent to file a telephonic notice of error.

60. Throughout the Relevant Period, EDD Cardholders could not file notices of error with Respondent online, through Respondent's other (non-prepaid) customer service divisions, or in person at Respondent's branches.

61. EDD Cardholders who called for assistance after their EDD Prepaid Debit Card Account was subject to unauthorized EFTs were required to navigate Respondent's prepaid call center divisions staffed by vendor agents.

62. Throughout the Relevant Period, Respondent represented on its EDD Debit Card FAQ webpage that it would provide EDD Cardholders with "dedicated customer service representatives" who are "available 24 hours a day, 7 days a week" to help EDD Cardholders "investigate transactions."

63. Respondent further advised consumers in its EDD Cardholder Agreement, which Respondent mailed to all new EDD Cardholders, that "Telephoning is the best way of keeping your possible losses down."

64. Under Respondent's "Zero Liability" guarantee, which Respondent also includes in its EDD Cardholder Agreement, Respondent represents that EDD Cardholders will incur no liability for unauthorized use of their EDD Prepaid Debit Card up to the amount of the unauthorized transactions, provided they notify Respondent within a reasonable amount of time.

65. For much of 2020, EDD Cardholders faced long hold times when attempting to file a notice of error with Respondent over the phone and take advantage of Respondent's "Zero Liability" guarantee for unauthorized use of cardholders' EDD Prepaid Debit Cards.

66. Throughout the Relevant Period, EDD Cardholders were required to first speak with an agent in Respondent's main prepaid call center before being transferred to Respondent's prepaid claims initiation division, which was the only division authorized to accept EDD Cardholders' notices of error over the phone.

67. From May 1, 2020 to July 1, 2020, prepaid debit cardholders nationwide had to wait on average nearly two hours to speak with an agent in Respondent's prepaid claims initiation division.

68. From September 1 to December 1, 2020, prepaid debit cardholders nationwide had to wait on average over an hour to speak with an agent in Respondent's prepaid claims initiation division.