# EXHIBIT 4

Slawin v. Bank of Am. Merch. Servs., No. 1:19-cv-04129-AT, Dkt. No. 197 (N.D. Ga. Sept. 24, 2025)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ERIC SLAWIN,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA MERCHANT SERVICES,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION NO.<br>1:19-cv-4129-AT |

**ORDER**

This whistleblower retaliation case comes before the Court on a Motion for Summary Judgment brought by Defendant Bank of America Merchant Services ("BAMS") [Doc. 175]. Plaintiff Eric Slawin, a former BAMS employee, alleges he was fired for reporting a compliance issue and possible fraud within the entity, in violation of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A; the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5567; and the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6. (Compl., Doc. 1.) His former employer claims the real issue was that Mr. Slawin violated company policy by sending confidential work emails to his personal email address. The nature of Mr. Slawin's retaliation claims—specifically, whether he reasonably believed that BAMS's conduct was fraudulent, and whether his reports to supervisors contributed to his termination—are inherently fact-intensive issues, making a summary judgment an inapt vehicle for adjudication.

# I. BACKGROUND[1]

## A. PAN Data & PCI Protections

BAMS was a joint venture between a subsidiary of First Data Corporation (now owned by Fiserv) and a subsidiary of Bank of America. During all times relevant, First Data and Bank of America were publicly traded entities. That joint venture ended in June 2020. (MTD Ord., Doc. 47 at 2, 2 n.4). During its operation, BAMS entered into agreements to provide payment processing services to merchant customers. (*Id.* at 3). Under those Merchant Processing Agreements, BAMS agreed to operate in compliance with certain Payment Card Industry ("PCI") standards. (*Id.*). PCI standards cover organizations that process and transmit cardholder data, such as credit and debit card numbers. That can include entities like banks, merchants, or payment processors. The industry is governed by the PCI Data Security Standards ("PCI DSS"), which are intended to protect cardholder data from security vulnerabilities. (Pl.'s SDMF, Doc. 182-2 ¶¶ 11–12). Any entity that transmits or receives a Primary Account Number ("PAN")—in other words, the account number linked to a credit or debit card—is required to comply with the PCI DSS. (*Id.* ¶¶ 9–13). These standards are not governmentally imposed, but rather are agreed to by contract.

---

[1] When deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion (here, Plaintiff). *See, e.g.*, *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007). Bearing that in mind, the Court provides the following statement of facts to place the Court's legal analysis in the context of this case. This factual description does not represent actual findings of fact. *In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007).

The parties agree that, by January 2017, BAMS had identified instances in which its employees were transmitting full PAN data. That type of transmission would require the company to be PCI compliant, which it was not. (Def.'s SUMF, Doc. 175-2 ¶ 150; Pl.'s SDMF, Doc. 182-2 ¶ 14). While BAMS did not typically handle full PAN numbers, the entity realized it was doing so while processing chargebacks. (Pl.'s SDMF, Doc. 182-2 ¶ 34). The identification of the PCI compliance issue raised two possibilities: BAMS could become PCI compliant, which would be a costly undertaking, or alternatively, could change its processing of chargebacks and other transactions to ensure BAMS personnel were never transmitting PAN data. (Def.'s SUMF, Doc. 175-2 ¶¶ 170–171; Pl.'s SDMF, Doc. 182-2 ¶ 18).

**B. Mr. Slawin's Assignment**

Plaintiff joined BAMS in December 2015 as the Vice President Operations Control Officer. (Pl.'s SDMF, Doc. 182-2 ¶ 1). Prior to his work at BAMS, Mr. Slawin had spent more than two decades in securities and regulatory banking and compliance. (*Id.* ¶ 2). In June 2017, Plaintiff was added to an email chain discussing BAMS's transmission of full PAN data and its alleged PCI non-compliance. (*Id.* ¶ 42). He was assigned by his supervisor Natasha Collins to prepare a "self-identified audit issue" regarding the concern—essentially, an internal investigation undertaken to understand the scope of the concern and propose solutions. (Def.'s SUMF, Doc. 175-2 ¶¶ 162, 174; Pl.'s SDMF, Doc. 182-2 ¶ 50). According to Defendants, "Slawin did not timely initiate the [self-audit]

related to the use of PAN data," and that "delay in initiating the [self-identified audit issue] caused a corresponding delay in BAMS's ability to fully assess and remediate issues related to the use of PAN data." (Def.'s SUMF, Doc. 175-2 ¶¶ 175–176). On September 26, 2017, Ms. Collins provided Mr. Slawin with a coaching form related to his "failure to timely develop and submit audit and remediation plans, his failure to adequately follow up to ensure the remediation plan was being implemented in a timely fashion, and his failure to provide reporting on status or to escalate challenges unless requested to do so." (*Id.* ¶¶ 175–180).

Mr. Slawin contends that, "[a]t all relevant times, [he] was aware that merchants for whom BAMS did credit or debit card processing had to certify that they were PCI compliant." (Pl.'s SDMF, Doc. 182-2 ¶ 43). In July 2017—after being assigned the audit to review the entity's PCI compliance—he "became aware that BAMS was required to be PCI compliant under the Merchant Services Agreements (MSA's) that it had entered into . . . with merchants to do their credit or debit card processing." (*Id.* ¶ 44). He also claims he found agreements online between BAMS and the State of Delaware indicating that BAMS was PCI compliant (which it was not). (*Id.* ¶ 45).

"One area in which the issue of BAMS' non-PCI compliance rose was in the context of how BAMS should respond to client questionnaires that raised questions regarding how data was secured by BAMS, and direct inquiries about whether BAMS was PCI compliant." (*Id.* ¶ 47; *see, e.g.*, Opp'n to MSJ, Ex., Doc. 182-27 (August/September 2017 email chain regarding PCI compliance questionnaire)).

Plaintiff claims his designated "task was to deflect questions from merchants as to whether BAMS was PCI compliant" by pointing to the fact that one of BAMS's parent entities, First Data, was PCI compliant. (Pl.'s SDMF, Doc. 182-2 ¶¶ 56–57; *see also, e.g.*, Opp'n to MSJ, Ex., Doc. 182-28 (October 2017 email chain regarding PCI compliance questionnaire from municipality) ("I am in the line of fire when it comes to answering these client questionnaires.")). Plaintiff indicates he "was uncomfortable being put in a position" in which he felt he was "misrepresent[ing] the facts," and he "was afraid of being made a scapegoat or fall guy if it got out that BAMS was not PCI compliant." (Pl.'s SDMF, Doc. 182-2 ¶¶ 58–59).

Plaintiff claims that, over several months, he raised the issue of BAMS's alleged PCI non-compliance with multiple supervisors. (*Id.* ¶ 74). "Among the numerous individuals whom Slawin spoke to about BAMS' non-PCI compliance and his concerns about fraud and the ramifications if this information were to become public, were Brian Rubin, Sherra Grissom, Mark Kendall, Natasha Collins, and Walt Zimerman, who was a Senior Sales executive at BAMS assigned to the Home Depot relationship." (*Id.* ¶ 75).[2] Mr. Slawin alleges he "had at least four or five conversations with Mr. Kendall in which [he] told Mr. Kendall that BAMS was acting fraudulently and misleading its customers . . . both when Mr. Kendall was Slawin's peer, and after September 2017, when Kendall was Slawin's immediate supervisor." (*Id.* ¶ 62). Mr. Slawin also says that "[d]uring the period August

[2] The Court construes Mr. Slawin's reference to "non-PCI compliance" above as meaning non-compliance with Payment Card Industry ("PCI") standards.

through September 2017, [he] had biweekly meetings with Natasha Collins," during which he "discussed the creation of a self-identified audit issue and mitigation of BAMS' non-PCI compliance [and] repeatedly advised Ms. Collins about his concerns regarding BAMS' non-PCI compliance." (*Id.* ¶¶ 65, 75–80).

Defendant, conversely, alleges that "[p]rior to the termination of his employment at BAMS, Slawin did not tell anyone at BAMS that he felt BAMS was engaging in conduct that violated" either the Dodd-Frank Act, the Sarbanes-Oxley Act, or the Consumer Financial Protection Act. (Def.'s SUMF, Doc. 175-2 ¶¶ 213–15). Defendant also alleges that Mr. Slawin did not "put any of his concerns that BAMS was engaged in illegal conduct or fraud in writing and provide them to anyone within BAMS," nor did he "express concerns to anyone in BAMS's Office of the General Counsel [or Human Resources department] that BAMS was somehow engaged in fraudulent conduct." (*Id.* ¶¶ 217–27).

### C. Alleged Policy Violations & Termination

"In or about August 2017, [Mr. Slawin] began downloading emails to his personal email regarding the PAN data and BAMS' PCI noncompliance issue . . . because he was concerned about being drawn into fraudulent and improper data security practices by BAMS." (Pl.'s SDMF, Doc. 182-2 ¶ 97). He claims that "[t]o his understanding and knowledge at the time, downloading the emails did not violate any policy of BAMS." (*Id.* ¶ 100). Mr. Slawin did not disseminate these emails to others, including anyone outside of BAMS. (*Id.* ¶¶ 115, 118).

On November 30, 2017, a member of the information security team emailed BAMS human resources ("HR") to flag that the team "had detected multiple instances of Slawin sending emails from his work email address [] to his personal email address." (Def.'s SUMF, Doc. 175-2 ¶ 24). As a result of that report, HR staffer Mike Solan initiated an investigation into these emails, including reaching out to Mr. Kendall, then Plaintiff's direct supervisor. (*Id.* ¶¶ 27–30). "Based upon Solan's personal investigation and evaluation of the facts at hand, Solan independently determined that Slawin violated the following BAMS policies: Slawin's Proprietary Rights and Information Agreement with BAMS, the Associate Handbook, the Information Security Policy . . . , and the Code of Ethics." (*Id.* ¶ 71).

On Thursday, December 7, 2017, Mr. Solan wrote to his supervisor with "a summary of the Information Security Escalation regarding high risk confidential information that Eric Slawin sent to his personal email address." (Deposition of Mike Solan ("Solan Dep."), Ex. 42, Doc. 182-21 at 1). Mr. Solan indicated that "[t]he content of the material that Eric was forwarding to his personal email is related to the way that BAMS treats Primary Account Number (PAN) and associated PCI implications." (*Id.*). Mr. Solan also listed numerous recommended next steps, which included "[p]artner[ing] with Legal to understand whether [Mr. Slawin] has any whistleblower protections" and "[d]etermin[ing] the appropriate disciplinary action, including termination." (*Id.* at 2).

On Friday, December 8, 2017, Mr. Slawin was asked to join a meeting with Mr. Solan and Mr. Kendall. (Pl.'s SDMF, Doc. 182-2 ¶ 146). Defendant represents

that, during investigations like this one, "members of BAMS's HR department routinely interviewed the employee responsible for the conduct at issue" to understand the business justification for using a personal email address, determine whether the employee had otherwise disclosed business information, and provide next steps to the employee regarding protecting the information. (Def.'s SUMF, Doc. 175-2 ¶¶ 48–52). During the meeting, which lasted 5–10 minutes, Mr. Solan asked Mr. Slawin why he had sent emails to his personal account but allegedly "did not identify the specific emails that he was talking about" and did not ask Mr. Slawin to return or delete those emails. (Pl.'s SDMF, Doc. 182-2 ¶¶ 147–150). He did indicate that he would send Mr. Slawin some documents for his review. (*Id.* ¶ 151). Later that day, Mr. Slawin received an email from BAMS's Associate General Counsel "stating that he had violated various company policies by downloading the emails, directing [him] to 'cease and desist' from downloading any further emails, requiring [him] to delete the emails that he had downloaded, and requiring [him] to sign a Declaration that he had done [so]." (*Id.* ¶ 155; Def.'s SUMF, Doc. 175-2 ¶¶ 63–64).

Defendant contends that the decision to terminate Mr. Slawin was made that day, December 8, based on "Slawin's policy violations and the loss of trust that resulted from Slawin's conduct during his interview with Solan" (Def.'s SUMF, Doc. 175-2 ¶¶ 116–17). In his notes dated December 8, Mr. Solan appears to have written that "the decision (as approved by Mark Kendall (Mgr), Maryann D Castro (Associate Relations), Meg Troughlon (Legal), and Lori Orrico (HRBP) is to

terminate [Mr. Slawin's] employment, effective immediately, and request an immediate shutoff of all his systems access." (Solan Dep., Ex. 51, Doc. 182-25 at 2). Mr. Solan represented that he "tried to instant message and call Eric so that we could discuss this decision, as well as next steps, but received no response." (*Id.*).

On Monday, December 11, 2017, Mr. Solan wrote in his notes that "Eric has not answered or responded to multiple attempts to call him to explain the investigation results, as well as the termination notice." (*Id.* at 3; Def.'s SUMF, Doc. 175-2 ¶¶ 123–129). Mr. Slawin, however, alleges that contemporaneous emails between the two "reflect[] only one attempt to call Mr. Slawin . . . on the morning of December 11, 2017" and do "not refer to or memorialize any attempt to call Mr. Slawin on December 8, 2017, nor any attempt to contact Mr. Slawin by Instant Message." (Pl.'s SDMF, Doc. 182-2 ¶ 165). The parties agree, however, that on December 11, Mr. Slawin emailed Mr. Solan indicating that he would not delete the emails or sign the declaration as requested, because it would "make it appear" that he "agree[d] with the actions taken by other parties to withhold information," presumably referring to information about BAMS's alleged PCI non-compliance. (*Id.* ¶ 162; Solan Dep., Ex. 51, Doc. 182-25 at 2).

On Tuesday, December 12, 2017, Mr. Solan and Mr. Slawin finally connected on a call, during which Mr. Solan informed Mr. Slawin of his termination. Mr. Slawin also received an email from Mr. Solan to his personal account that day with a letter terminating his employment from BAMS. (Def.'s SUMF, Doc. 175-2 ¶¶ 131–135; Pl.'s SDMF, Doc. 182-2 ¶ 160; MSJ, Ex. 24, Doc. 175-27). Defendant's position

is that "[t]he decision to terminate Slawin's employment with BAMS was made and was effective December 8, 2017." (Def.'s SUMF, Doc. 175-2 ¶ 7). They contend that "[t]he termination notice contains typographical errors identifying Slawin's date of termination as December 7, 2017, when in fact his date of termination is December 8, 2017." (*Id.* ¶ 136).

On December 12, Mr. Slawin filed a whistleblower complaint with the Securities and Exchange Commission through its online portal. (Compl., Doc. 1 ¶ 106). Specifically, Plaintiff reported "BAMS' PCI non-compliance, its refusal to become PCI compliant and fraudulent representations to its customers and shareholders, and that he was terminated when he protested the effort to make him complicit in BAMS' fraud on its customers and shareholders." (*Id.* ¶ 107; MSJ, Ex. 9, Doc. 175-12). He also submitted equivalent complaints to the Consumer Financial Protection Bureau, the Federal Trade Commission, and the Occupational Safety and Health Administration in the days and weeks after his termination. (MSJ, Ex. 10, Doc. 175-13; *id.*, Ex. 12, Doc. 175-15).

Mr. Slawin represents that "[d]uring his employment at BAMS, [his] use of alcohol increased" to roughly one-fourth of a bottle a day "as he was put under increasing pressure to misrepresent BAMS non-PCI compliance to merchants, and his distress at BAMS' fraud." (Pl.'s SDMF, Doc. 182-2 ¶ 183).

In September 2019, Plaintiff brought suit against BAMS, its parent entities Bank of America and First Data Corporation, and Fiserv, which at that point had acquired First Data. (Compl., Doc. 1). In September 2020, the Court dismissed

Bank of America, First Data Corporation, and Fiserv from the suit in their entirety. (MTD Ord., Doc. 47). The Court also dismissed the Dodd-Frank claim against BAMS. (*Id.*). After a protracted discovery period, Defendant BAMS moved for summary judgment on the remaining claims. [MSJ, Doc. 175]. That Motion is fully briefed and ripe for the Court's consideration.

## II. LEGAL STANDARD

The Court shall grant summary judgment if the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.*

When ruling on a Motion for Summary Judgment, the Court must view all evidence in the record in the light most favorable to the non-moving party (here, Plaintiff) and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets this initial burden, to survive summary judgment, the non-moving party must then

present competent evidence beyond the pleadings to show that there is a genuine issue for trial. *Id.* at 324–26.

The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Plaintiff's two remaining claims are conceptually and legally similar. First, Mr. Slawin has sued under the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1514A, which "prohibits retaliation against an employee who provides information . . . or assists in an investigation into conduct that the employee reasonably believes is prohibited by the Act, and where the information or assistance is provided to a supervisor or other employee with authority to investigate." *Marullo v. Rivian Auto., LLC*, 2025 WL 1202225, at *5 (N.D. Ga. Mar. 26, 2025) (quoting *Thomas v. Tyco Int'l Mgmt. Co.*, 416 F. Supp. 3d 1340, 1358 (S.D. Fla. 2019)).

Under SOX, "an employee must prove that (1) [he] engaged in protected activity as defined by SOX; (2) the employer knew of the protected activity; (3) [he] suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable personnel action." *Cruzan v. Hewlett Packard Enter. Co.*, 2020 WL 10574160, at *5 (N.D. Ga. Sept. 23, 2020) (citing *Gale v. U.S. Dep't of Lab.*, 384 F. App'x 926, 929 (11th Cir. 2010)).

"[A]n employee bears the initial burden of making a *prima facie* showing of retaliatory discrimination; the burden then shifts to the employer to rebut the employee's *prima facie* case by demonstrating by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity." *Johnson v. Stein Mart, Inc.*, 440 F. App'x 795, 801 (11th Cir. 2011). "[T]he defendant's burden under [§ 1514A(a)] is notably more than under other federal employee protection statutes, thereby making summary judgment against plaintiffs in Sarbanes–Oxley retaliation cases a more difficult proposition." *Kuba v. Disney Fin. Servs., LLC*, 623 F. Supp. 3d 1290, 1302–03 (M.D. Fla. 2022).

Similarly, the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5567, bars retaliation against employees who report what they reasonably believe to be a violation of the CFPA or "any other provision of law that is subject to the jurisdiction of the [Consumer Financial Protection Bureau,] or any rule, order, standard or prohibition prescribed by the Bureau." Under the CFPA, Plaintiff must establish that "(1) he engaged in protected activity; (2) the employer knew or

suspected, either actually or constructively, that he engaged in the protected activity; (3) he suffered an unfavorable personnel or employment action; and (4) the protected activity was a contributing factor in the unfavorable action." (MTD Ord., Doc. 47 at 7 (citing *Veard v. F&M Bank*, 704 F. App'x 469, 473 (6th Cir. 2017)). Given the relative dearth of CFPA jurisprudence and the similarities between the two statutes, courts often look to SOX case law in interpreting the CFPA. (*See, e.g.*, *id.* at 25; *see also Veard*, 704 F. App'x at 474).

## III. DISCUSSION

Defendant's Motion for Summary Judgment is based on the first and fourth elements of SOX and the CFPA. BAMS argues, first, that Mr. Slawin did not engage in a protected activity under either law. Second, BAMS argues that Mr. Slawin cannot show that any protected activity contributed to his termination. (MSJ, Doc. 175-1 at 16, 24). The Court addresses Defendant's arguments in that order.

### A. Protected Activity

#### i. SOX

"To engage in 'protected activity' [under SOX], an employee must provide information regarding any conduct he reasonably believes to be one or more of six enumerated types of misconduct: mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344), securities fraud (18 U.S.C. § 1348), a violation of any rule or regulation of the Securities and Exchange Commission ('SEC'), or any provision of federal law relating to fraud against shareholders." *Sturdivant v. Chem. Waste Mgmt., Inc.*, 2020 WL 1083212, at *4 (N.D. Ala. Mar.

5, 2020) (quoting 18 U.S.C. § 1514A(a)(1)). "Further, the information must be provided to, or the investigation conducted by, (1) a federal regulatory or law enforcement agency, (2) any member or committee of Congress, or (3) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)." *Id.*

This definition raises two pertinent questions: (1) whether Mr. Slawin reasonably believed the conduct described constituted wire fraud, bank fraud, securities fraud, an SEC violation, or illegal fraud on shareholders and (2) whether Mr. Slawin actually provided that information to his supervisors Mr. Kendall and/or Mr. Collins, as asserted.[3]

**1. Reasonable Belief**

The Eleventh Circuit has "conclude[d] that § 1514A(a)(1) requires an employee to demonstrate both a subjective belief and an objectively reasonable belief that the company's conduct violated a law listed in that section." *Gale*, 384 F. App'x at 930. "[T]he inquiry into whether an employee had a reasonable belief [for purposes of a SOX retaliation claim] is necessarily fact-dependent, varying with the circumstances of the case." *Thomas v. Tyco Int'l Mgmt. Co., LLC*, 262 F. Supp. 3d 1328, 1334 (S.D. Fla. 2017) (quoting *Rhinehimer v. U.S. Bancorp Investments, Inc.*, 787 F.3d 797, 811–12 (6th Cir. 2015)). "[A] complainant will not

[3] It is undisputed that, during at least some of these conversations with Mr. Slawin, Mr. Kendall and Ms. Collins both had "supervisory authority over [him]." 18 U.S.C. § 1514A(a)(1)(C). (*See* Pl.'s SDMF, Doc. 182-2 ¶¶ 5–7).

be penalized for failing to identify the specific SOX provision at issue. . . . [And] while the employee need not 'definitively and specifically' prove each element of fraud, he must make more than a conclusory allegation." *Ronnie v. Off. Depot, LLC*, 81 F.4th 1345, 1351 (11th Cir. 2023).

First, then, Mr. Slawin must establish that he actually and subjectively believed—in light of his education and experience—that BAMS's PCI non-compliance, and its failure to share that non-compliance with merchant customers, constituted fraud as covered by § 1514A(a)(1). *See Gale*, 384 F. App'x at 930; *Thomas*, 416 F. Supp. 3d at 1361. Mr. Slawin has testified to his subjective belief, based on his previous work experience, that BAMS was committing both securities fraud and deceit upon shareholders:

> I came to a belief in or about July 2017 that BAMS was committing fraud by omission by not disclosing the fact that it was not PCI compliant, which could affect the shareholders of public entities that were having their customers' purchases processed by BAMS, especially if there was a data breach. I also believed that the omission could affect shareholders of one of BAMS' parent companies. Bank of America. . . . I believed that the fraudulent omission could constitute bank fraud and securities fraud, at the very least, and possibly other types of fraud made unlawful under federal statutes. . . . In particular, I was thinking about the 1933 and 1934 acts of the SEC.
>
> In my job at FINRA, I was involved mostly with the 1934 act from the perspective of the public, regarding representations for sales of securities, and at J.P. Morgan, in the private sphere, I was mostly involved with the 1933 act for underwriting and disclosures in offering documents for the sales of securities.

(Declaration of Eric Slawin ("Slawin Decl."), Doc. 182-3 ¶ 49; *see also* Deposition of Eric Slawin ("Slawin Dep."), Doc. 174-1 175:25–176:7, 183:5–18, 193:10–20).[4]

Defendant asserts that "Slawin's [deposition] testimony conclusively shows he lacked a subjective belief that any statute was violated" because he "never informed anyone at BAMS that he believed any conduct violated the CFPA or SOX, and he could not articulate any subjective understanding of how such statutes were violated." (MSJ, Doc. 175-1 at 17). Defendant's contention conflicts with the principle that a potential whistleblower "will not be penalized for failing to identify the specific SOX provision at issue." *Ronnie*, 81 F.4th at 1351. Slawin's own repeated testimony as captured above demonstrates his subjective belief and understanding regarding BAMS's alleged fraud and, in particular, its fraudulent omission of its PCI non-compliance from shareholders, who could be adversely impacted. *Cf. Gale*, 384 F. App'x at 930 (finding no subjective belief where plaintiff testified that he "did not believe" that "the company was engaging in any kind of illegal or fraudulent activities").

Next, the Court must also determine whether, viewing the facts in the light most favorable to Mr. Slawin, he had an objectively reasonable belief that BAMS's conduct constituted fraud. "The objective component of the 'reasonable belief' test is evaluated based on the knowledge available to a reasonable person in the same

---

[4] The Court notes that "[a]n employee can engage in § 1514A protected activity even if the reported conduct did not actually constitute a violation of one of the laws or regulations enumerated in § 1514A(a)(1)." *Bozeman v. Per-Se Techs., Inc.*, 456 F. Supp. 2d 1282, 1359 (N.D. Ga. 2006).

factual circumstance with the same level of training and experience as the aggrieved employee." *Thomas*, 416 F. Supp. 3d at 1361 (cleaned up). "The question of objective reasonableness is amenable to disposition as a matter of law, but only when no reasonable person could believe there was conduct that fit into one of the listed categories." *Shea v. Kohl's Dep't Stores, Inc.*, 2018 WL 2676164, at *5 (N.D. Ala. Feb. 8, 2018) (quoting *Burns v. Medtronic, Inc.*, 2016 WL 3679369, at *4 (M.D. Fla. July 12, 2016)). "In determining what information sufficiently paints a picture of reasonable belief, the Eleventh Circuit employs a totality of the circumstances test," which includes "whether the employer acted with the requisite scienter, whether the misstatement was material, whether the misstatement was relied upon, and whether it yielded economic loss." *Marullo v. Rivian Auto., LLC*, 2025 WL 1202225, at *7 (N.D. Ga. Mar. 26, 2025) (Batten, C.J.) (quoting *Ronnie*, 81 F.4th at 1350). Thus, "[o]ften the issue of 'objective reasonableness' involves factual issues and cannot be decided in the absence of an adjudicatory hearing." *Thomas*, 416 F. Supp. 3d at 1361.

At this juncture, Plaintiff has alleged the objective reasonableness of his belief sufficiently to create a disputed issue for the jury's resolution. Specifically, the evidence Mr. Slawin has put forth includes: BAMS's acknowledged PCI non-compliance (Opp'n to MSJ, Ex., Doc. 182-5); BAMS's representations of PCI compliance (MSJ, Ex. 44, Doc. 176-15); and the potential fallout for BAMS's merchant customers and their shareholders (Slawin Decl., Doc. 182-3 ¶¶ 62–74). This evidence supports Plaintiff's objectively reasonable asserted understanding or

belief that BAMS was engaging in a practice of material omissions to its merchant clients. *See also Burns*, 2016 WL 3769369, at *4 (rejecting defendants' argument that an employee must establish the reasonableness of his or her belief as to each element of the fraud violation underlying a SOX retaliation claim). Plaintiff alleges that BAMS knew about its own PCI non-compliance as early as January 2017 but did not act to remediate its misrepresentations. That allegation, in turn, supports the objective reasonableness of Mr. Slawin's belief, at least as shown at this juncture of the litigation.[5] The Court thus finds that Mr. Slawin has created a genuine issue of material fact as to his reasonable belief that BAMS was engaged in fraudulent conduct and that he believed that his concerns regarding this information should be communicated to BAMS management staff. Plaintiff's ascertainment of this information and conduct, if proven at trial, would constitute protected activity under SOX.

**2. Disclosure to Supervisors**

The second requirement of "protected activity" under SOX is that the putative whistleblower must report the conduct at issue to a supervisory authority. Mr. Slawin represents that, on multiple occasions, he described conduct that he reasonably believed to be fraud to at least two supervisors. For example, Plaintiff

---

[5] The Eleventh Circuit has held that a failure to demonstrate scienter, a key element of fraud, can doom a whistleblower's claim that they reasonably believed fraud was occurring. *See Ronnie v. Off. Depot, LLC*, 81 F.4th 1345, 1352 (11th Cir. 2023). Given Mr. Slawin's allegation of BAMS's knowledge, however, lack of scienter is not an issue for Mr. Slawin's SOX claim.

says he "had at least four or five conversations with Mr. Kendall in which Slawin told Mr. Kendall that BAMS was acting fraudulently and misleading its customers"—both when Mr. Kendall was Mr. Slawin's peer, and when he was his supervisor. (Pl.'s SDMF, Doc. 182-2 ¶ 62).[6] Mr. Slawin also "noted his concern [to Mr. Kendall] that it could affect shareholders, both of the merchants and of Bank of America[.]" (*Id.*; *see also* Slawin Dep., Doc. 174-1 191:21–194:23 (detailing discussions with Mr. Kendall)). According to Mr. Slawin, "Kendall agreed that BAMS nondisclosure of its PCI noncompliance was fraud." (SDMF, Doc. 182-2 ¶ 62). *See Shea*, 2019 WL 1452887, at *6 (N.D. Ala. Apr. 2, 2019) (denying summary judgment on SOX claim where plaintiff "testified that he did believe it was fraud . . . based on his prior experience with credit application frauds" and supervisor to whom plaintiff reported suspicions "described the activity . . . as 'shady,' an acknowledgment that he too believed something illegal was afoot").

Mr. Kendall's representations during his deposition neither reflect those conversations, nor align with that description. While Mr. Kendall agreed that he was working with Mr. Slawin to investigate the PCI non-compliance issue, he primarily characterized their conversations as "interview[ing] different businesses" within BAMS to "understand the scope of the problem" and "formulate an approach for how to remediate it." (Deposition of Mark Kendall ("Kendall Depo"), Doc. 196-1 95:5–9, 96:4–22). Mr. Kendall indicated that he "[didn't]

[6] Mr. Kendall was originally the Director of Risk and Control, reporting to Ms. Collins, before he was promoted to supervise Mr. Slawin. (Pl.'s SDMF, Doc. 182-2 ¶ 6).

recall" whether he, like Mr. Slawin, was "also losing confidence that the issue could be remediated." (*Id.* 96:1–3).

Mr. Slawin also identifies similar conversations with Ms. Collins:

> During the period August through September 2017, Slawin had biweekly meetings with Natasha Collins. During these meetings Slawin discussed the creation of a self-identified audit issue and mitigation of BAMS' non-PCI compliance. Slawin repeatedly advised Ms. Collins about his concerns regarding BAMS' non-PCI compliance. Slawin reiterated several times that he was uncomfortable being asked to represent to BAMS' clients and to internal BAMS' teammates that BAMS was PCI compliant when Slawin knew that it was not.

(SDMF, Doc. 182-2 ¶ 65; Slawin Decl., Doc. 174-1 204:11–18, 216:9–21; 218:11–219:22).[7]

But Ms. Collins's declaration and deposition testimony directly conflict with this account. Ms. Collins explicitly disputed the notion that "Mr. Slawin . . . discussed with [her] his concern about what merchants were being told about BAMS's PCI noncompliance." (Deposition of Natasha Collins ("Collins Dep."), Doc. 196-2 43:21–44:1). While Mr. Slawin says he reiterated to Ms. Collins that "he was uncomfortable being asked to represent to BAMS' clients . . . that BAMS was PCI compliant," she denied that "Eric Slawin ever express[ed] to [her] his concern that BAMS's clients should be told that BAMS was not PCI compliant." (*Id.* 42:24–43:2; *see also id.* 42:15–42:19 (stating she "did not have any conversations with [Eric] about" him "telling BAMS merchant clients that BAMS was not PCI compliant";

[7] Ms. Collins served as the Senior Vice President, Head of Sales Operations and Planning at BAMS, and was Mr. Slawin's supervisor until around September 2017. (Pl.'s SDMF, Doc. 182-2 ¶ 5).

*see also id.* 84:14–85:2 (denying any conversation with Mr. Slawin that this conduct was "fraudulent or dishonest")). She also represents that, contrary to Mr. Slawin's assertions, she was "unaware of any instance in which BAMS responded to a merchant questionnaire by affirmatively representing that it maintained an independent certification of its own PCI compliance." (Declaration of Natasha Collins ("Collins Decl."), Doc. 176-8 ¶ 26).

Finally, Mr. Slawin represents that he "specifically told Sherra Grissom that BAMS was engaged in fraud." (Pl.'s SDMF, Doc. 182-2 ¶ 77). Ms. Grissom handled Enterprise Risk Management and thus, Mr. Slawin indicates, she was "another reporting [] line for [him]." (*Id.*). "In November 2017, Slawin told Grissom 'that [he] felt that the fact that [the non-compliance] [wasn't] being disclosed to clients is omission and [] fraud." (*Id.*; *see also* Slawin Dep., Doc. 174-1 188:2–190:9).

As is clear, Mr. Slawin's accounts of his purported discussions with his supervisors about BAMS's PCI non-compliance—and how that issue was being represented to merchant clients—create serious factual discrepancies. Mr. Slawin directly declares that he reported perceived fraud to both Mr. Kendall and Ms. Collins. Mr. Kendall and Ms. Collins, for their part, deny ever discussing PCI non-compliance with Mr. Slawin in a way that implied deceit or fraud. Rather, both recall their conversations with him as focused on his assigned self-audit.[8]

---

[8] It does not appear that Ms. Grissom was deposed, submitted a declaration, or otherwise offered testimony in Defendant's factual proffers.

This discrepancy—i.e., whether Mr. Slawin reported BAMS's perceived fraudulent conduct to supervisory authorities—is a genuine dispute of material facts that precludes summary judgment. Viewing the evidence in the light most favorable to the non-moving party, the Court must, at this juncture, credit Mr. Slawin's account that he repeatedly discussed what he believed was fraudulent conduct with two supervisors and that at least one, Mr. Kendall, "agreed that BAMS nondisclosure of its PCI noncompliance was fraud." (SDMF, Doc. 182-2 ¶ 62). *See, e.g., Collins v. Beazer Homes USA, Inc.*, 334 F. Supp. 2d 1365, 1377 (N.D. Ga. 2004) (denying summary judgment on issue of protected activity where "the individuals to whom [Plaintiff's complaints] were addressed understood the serious nature of Plaintiff's allegations"). Given this and other factual issues, the Court cannot grant summary judgment to the Defendant on its SOX claim.

**ii. CFPA**

Given the significant similarities between the anti-retaliation provisions in SOX and the CFPA, the Court need not replicate its above analysis. (*See* MTD Ord., Doc. 47 at 25 ("The Court looks to decisions interpreting the similar protected activity provision found in SOX."); *see also Veard*, 704 F. App'x at 474). The Court has already found that Plaintiff has created a genuine dispute of material fact regarding whether his reports were "protected activities," specifically whether he reasonably believed BAMS's conduct was fraudulent and whether he reported that belief to supervisory authorities. The Court has also found that "BAMS is []

engaged in providing a consumer financial service and is thus" covered by the CFPA. (MTD Ord., Doc. 47 at 22).

Putting together these findings, the Court concludes that Mr. Slawin's reports are equally covered by the CFPA. For example, among Plaintiff's chief concerns was a data breach affecting one of BAMS's merchant clients. It is not difficult to imagine the impact of such a possible or actual breach on consumers within the ambit of the CFPB's regulation.[9] (*See, e.g.*, Slawin Decl., Doc. 182-3 ¶¶ 49; 62–74, 77). *See Becotte v. Coop. Bank*, 2017 WL 886967, at *7 (D. Mass. Mar. 6, 2017) (holding bank employee's internal complaints about manager's check-cashing scheme were protected activity because the conduct complained of "interfere[d] in some tangible way with consumer's rights in [their bank] account" and denying summary judgement on CFPA claim); *see also Real-Loomis v. Bryn Mawr Tr. Co.*, 2021 WL 1907487, at *10 (E.D. Pa. May 12, 2021) ("A plain reading of the CFPA's anti-retaliation clearly demonstrates that Plaintiff's acts of providing information to [his] superiors . . . and objecting to what [he] reasonably believed to be violations of banking laws, constituted protected activity. 12 U.S.C. § 5567(a)(1), (4).") (denying motion to dismiss CFPA claim where plaintiff alleged employer bank was "SOX non-compliant"). In light of its conclusion on Plaintiff's SOX claim and the equivalent precedent under the CFPA, the Court finds that Mr.

---

9 "To determine whether Plaintiff engaged in protected activity under the CFPA, the relevant inquiry is whether Plaintiff *reasonably believed* that Defendants' conduct violated the [relevant law], notwithstanding Defendants' ability to avoid liability for an actual violation." *Yoder v. O'Neil Grp., LLC*, 2017 WL 6206074, at *7 (D. Md. Dec. 8, 2017) (emphasis added).

Slawin has proffered sufficient evidence for a reasonable jury to find his conduct protected under the CFPA, though the jury might alternatively reach an opposing conclusion.

**B. Contribution to Termination**

As described above, to establish a violation of either SOX or the CFPA, Plaintiff must establish that: (1) he engaged in protected activity; (2) BAMS knew or suspected, either actually or constructively, that he engaged in the protected activity; (3) Plaintiff suffered an unfavorable personnel or employment action; and (4) the protected activity was a contributing factor in the unfavorable action. Thus far, the Court has concluded that Mr. Slawin has established genuine disputes of material facts as to whether he engaged in "protected activity" under SOX and the CFPA when he reported perceived fraud to his supervisors. Next, the Court addresses whether this potential protected activity contributed to his termination.[10]

"[A] whistleblower bringing a § 1514A claim must prove that his protected activity was a contributing factor in the unfavorable personnel action." *Murray v. UBS Sec., LLC*, 601 U.S. 23, 32 (2024). "[H]e need not [] prove that his employer acted with 'retaliatory intent.'" *Id.* "While many statutes dealing with employment discrimination apply a higher bar, . . . the incorporation of the contributing-factor standard in Sarbanes-Oxley reflects a judgment that 'personnel actions against

---

[10] Given the identical "contributing factor" test applied to retaliation claims under both statutes, the Court analyzes this element of these two statutory claims together.

employees should quite simply not be based on protected [whistleblowing] activities'—not even a little bit." *Id.* at 36–37 (quoting *Marano v. Dep't of Just.*, 2 F.3d 1137, 1141 (Fed. Cir. 1993)). Indeed, "[t]he contributing factor standard in SOX cases is indeed meant to be quite broad and forgiving." *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 350 (4th Cir. 2014). "A contributing factor," then, "is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Id.* at 348 (cleaned up).

"The Court considers evidence of temporal proximity in conjunction with other evidence of retaliation when determining on summary judgment whether 'the totality of the evidence establishes that there is a genuine dispute of material fact'" regarding Plaintiff's protected activity as a contributing factor in his termination. *Highsmith v. CSX Transportation, Inc.*, 2024 WL 3164660, at *6 (S.D. Ga. June 24, 2024) (quoting *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1270–76 (11th Cir. 2017)) (evaluating retaliation claim under Federal Railroad Safety Act, which also applies "contributing factor" standard). Close temporal proximity (i.e., a short period of time between the protected activity and adverse employment action) is an important, but not the only, category of circumstantial evidence to support an inference of retaliation. *Shea v. Kohl's Dep't Stores, Inc.*, 2019 WL 1452887 (N.D. Ala. Apr. 2, 2019) (holding circumstantial evidence of temporal proximity can preclude summary judgment in Sarbanes-Oxley Act claim case). *But see Thomas v. Tyco Int'l Mgmt. Co., LLC*, 416 F. Supp. 3d 1340, 1363 (S.D. Fla. 2019) ("The Eleventh Circuit Court of Appeals has stated

that *where 'there is no other evidence* tending to show causation, the temporal proximity must be very close.'" (emphasis added)); *Valdes v. Kendall Healthcare Grp., Ltd.*, 2024 WL 3356965, at *4 (11th Cir. July 10, 2024) (holding three-month gap between protected activity and adverse employment action was "not close enough to establish a causal connection 'without more'").

With that framework in mind, the Court notes that the timing of both Mr. Slawin's protected activities, and his termination, are in factual flux. Plaintiff represents that he had repeated conversations with Mr. Kendall and Ms. Collins regarding BAMS's PCI non-compliance—which the Court has found could constitute protected activity—throughout the fall of 2017, through at least September 2017, and with Ms. Grissom through roughly November 2017. (Pl.'s SDMF, Doc. 182-2 ¶¶ 62, 65, 77).

There are also factual disputes regarding when Mr. Slawin was actually terminated—and what conduct may have occurred in the days leading up to that decision. On December 8, Mr. Solan and Mr. Kendall first approached Mr. Slawin about his alleged policy violation. (MSJ, Ex. 28, Doc. 175-31 at 3). Mr. Solan claims that the decision to terminate Mr. Slawin was made immediately after that phone call, as memorialized in his investigation notes. (*Id.*). By December 11, Mr. Slawin had lost access to BAMS systems. (MSJ, Ex. 26, Doc. 175-29; Kendall Dep., Doc. 196-1 77:7–20 (testifying Mr. Slawin's access to BAMS system was "turned off approximately the 7th [or] 8th of December").

But Mr. Slawin was not notified of his termination until December 12. (MSJ, Ex. 24, Doc. 175-27 (December 12 termination letter)). The parties dispute the degree to which Mr. Solan attempted to contact Mr. Slawin to notify him of his termination in the interim. For example, Mr. Solan wrote in his investigatory notes that he had "tried to instant message and call Eric so that we could discuss this decision, as well as next steps, but received no response." (MSJ, Ex. 28, Doc. 175-31 at 3). And, in an email chain between the two on December 11, Mr. Solan asked Mr. Slawin to "give [him] a call back" to "discuss next steps" regarding their Friday conversation. However, they were not able to connect until December 12.

The precise day—and even time—of Mr. Slawin's termination is a crucial fact issue because, on December 11 around 4 PM, Mr. Slawin emailed Mr. Solan, refusing to delete the emails he had downloaded and making clear his continuing concerns about BAMS's non-compliance. (MSJ, Ex. 26, Doc. 175-29). If a jury were to find that Plaintiff's termination was not effectuated until December 12—when he was notified—then this response to Mr. Solan could constitute additional protected activity.

Given the possibility that Mr. Slawin's protected activities continued in the weeks and even days leading up to his termination, the Court finds it inappropriate to grant summary judgment on the issue of causation—especially given the "broad and forgiving" standard of the "contributing factor" rule under SOX. *Shea*, 2019 WL 1452887, at *7 (citing *Feldman*, 752 F.3d at 348). In *Kuba v. Disney Financial Services, LLC*, 623 F. Supp. 3d 1290 (M.D. Fla. 2022), for example, a district court

denied an employer summary judgment on a SOX retaliation claim because the plaintiff had presented multiple, repeated reports of the employer's misconduct and "a reasonable jury might fairly treat them as separate instances of protected activity," creating enough temporal proximity to infer causation. *Id.* at 1304 (finding that "[a] reasonable jury might conclude [] that [the employee's] second email . . . demonstrated a dogged commitment to the issue that [the employer] was unwilling to humor further" or that "the direct allegation in [the later] email . . . provided a more urgent cause for retaliation"). The same is true here. The inconsistencies around when Plaintiff's protected activity ended, and when precisely he was terminated, create a genuine dispute of highly material facts and preclude summary judgment.

Furthermore, "evidence of temporal proximity is not the only factor suggesting that [Plaintiff's] protected activity may have contributed to [his] termination." *Kuba*, 623 F. Supp. 3d at 1304. For example, in his initial December 7 report to his supervisor regarding Plaintiff's alleged policy violation, Mr. Solan specifically identified that the HR department should "[p]artner with Legal to understand whether [Mr. Slawin] [had] any whistleblower protections," confirming that Mr. Solan understood the subject matter of Mr. Slawin's emails and the implications of that information. (Opp'n to MSJ, Ex., Doc. 182-21); *see also Becotte*, 2017 WL 886967, at *7 (denying summary judgment on CFPA claim and noting "prior knowledge of the protected conduct by a decision maker has been held in multiple cases to be evidence of a causal link to an adverse action").

Similarly, in the wake of Plaintiff's termination, the focus of discussions was not his violation of BAMS's confidentiality policies, but rather the substance of the emails he downloaded. (*See, e.g.*, MSJ, Ex. 25, Doc. 175-28 (email from Information Security to other BAMS personnel) ("The information he sent to his gmail account had to do with PCI non-compliance and has the potential for reputational damage to BAMS.")). Though these facts cannot by themselves establish Mr. Slawin's potentially protected activity as a "contributing factor" to his termination, they are certainly sufficient to create the possibility that a jury could find as such.

Finally, BAMS argues that "Slawin cannot create an issue of fact as to whether the decision-makers in his termination were aware of any purported protected activity," precluding a finding that his potentially protected activity was a "contributing factor" in his termination. (MSJ, Doc. 175-1 at 15). This contention is not supported by the record. Defendant states that "BAMS's HR department (in coordination with the legal department) had exclusive authority over terminations for policy violations." (*Id.* at 24). As described above, however, Mr. Solan specifically identified that the HR department should "[p]artner with Legal to understand whether [Mr. Slawin] [had] any whistleblower protections," confirming that Mr. Solan understood the subject matter of Mr. Slawin's emails. (Opp'n to MSJ, Ex., Doc. 182-21).

Furthermore, Mr. Kendall—to whom Mr. Slawin contends he reported BAMS's PCI non-compliance—was a decisionmaker in Plaintiff's termination. In

his investigatory notes following the initial December 8 call with Mr. Slawin, Mr. Solan indicated that "[a]fter the interview ended, Mark Kendall and I connected and discussed his answers. We were both in alignment that . . . there is a complete loss of trust that [Mr. Slawin] can continue to handle proprietary, confidential, and/or sensitive information, which is a core requirement of both his position and employment at BAMS." (MSJ, Ex. 28, Doc. 175-31 at 3). Given the consultation of Mr. Kendall in the decision to terminate Mr. Slawin, it is difficult to give credence to BAMS's argument that none of the decisionmakers were aware of Plaintiff's potentially protected activity. This argument thus does not compel summary judgment for Defendant.

### C. Damages Mitigation

BAMS puts forth the alternative argument that it is "entitled to partial summary judgment, limiting Slawin's available back-pay and front-pay damages to at most the period between his termination at BAMS and the commencement of his employment at Wells Fargo Securities." (MSJ, Doc. 175-1 at 27). This argument is rooted in the fact that, after his termination from BAMS, Plaintiff was subsequently terminated from his next job at Wells Fargo for inappropriate conduct. (SDMF, Doc. 182-2 ¶¶ 186–191). "The question of damages is ordinarily one for the jury." O.C.G.A. § 51-12-12. The Court finds that, given the denial of summary judgment to Defendant and the underlying determination that factual, jury triable issues clearly remain, it would be inappropriate to determine limits on Plaintiff's compensatory damages at this time. *See Brown v. Ala. Dep't of Transp.*,

597 F.3d 1160 (11th Cir. 2010) (jury determinations of credibility relevant to determine mitigation of backpay issue); *see also Murray v. UBS Sec., LLC*, 2017 WL 1498051, at *14 (S.D.N.Y. Apr. 25, 2017) ("[G]enuine disputes of material fact preclude summary judgment in favor of Defendants on Plaintiff's mitigation of back-pay damages.").

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion for Summary Judgment [Doc. 175]. Construing the facts in the light most favorable to Mr. Slawin, summary judgment is inappropriate at this juncture. Nevertheless, the Court wishes to emphasize the challenging nature of these claims; both parties have significant hurdles to overcome to achieve success on the merits. Nearly eight years after Mr. Slawin's termination and six years since this suit was filed, it is also crucial to recognize the potential for this litigation to last many more years.

In light of these considerations, the Court will **REFER** this case for an in-person mediation with the next available Magistrate Judge on the rotation wheel. The parties are **DIRECTED** to file a status report at the conclusion of the mediation indicating whether this matter is resolved. If this case is not settled in mediation, the parties are **DIRECTED** to submit their proposed pretrial order within twenty (20) days of the conclusion of the mediation. The Clerk is **DIRECTED** to **ADMINISTRATIVELY CLOSE** this case pending mediation.

**IT IS SO ORDERED** this 24th day of September, 2025.

**Honorable Amy Totenberg**
**United States District Judge**